Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-60174-CIV-HUCK/O'SULLIVAN

LAWRENCE M. SCLAFANI,

       Plaintiff,

vs                                October 27, 2009

I.C. SYSTEM, INC.,

       Defendant.
_____/


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE JOHN O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**

DONALD YARBROUGH, ESQUIRE
P.O. Box 11842
Fort Lauderdale, Florida 33339
Appearing on behalf of the Plaintiff.

DALE GOLDEN, ESQUIRE
Golden & Scaz, PLLC
2124 West Kennedy Boulevard, Suite A
Tampa, Florida 33606
Appearing on behalf of the Defendant.


REPORTED BY:      Susan Suddarth, Court Reporter
                    Official Reporting Service, LLC
                    524 South Andrews Avenue, Suite 302N
                    Fort Lauderdale, Florida 33301
                    Telephone:  954-467-8204

1                              INDEX

2                                                          PAGE

3     **WITNESS:** LAWRENCE SCLAFANI

      **Direc**t by Mr. Yarbrough                    25
4     Cross by Mr. Golden                            36
      Redirect by Mr. Yarbrough                      49

5
      WITNESS:  SUSAN JOHNSON
6     Direct by Mr. Yarbrough                        54
      Cross by Mr. Golden                            89
7     Redirect by Mr. Yarbrough                      95

8                  EXHIBITS RECEIVED IN EVIDENCE

9     Plaintiff's Exhibit No. 1                          13

10    Defendant's Exhibit No. 1              13

11    Defendant's Exhibit No. 2              101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THEREUPON the following proceedings were had:

2              --------------------------------

3         **THE COURT:**  Good morning.  We are here in the case of

4    Lawrence Sclafani versus I.C. System, Inc., Case Number

5    09-60174-Civil, a consent case before me.  We are here for a

6    bench trial.  May I have appearances for the plaintiff first.

7         **MR. YARBROUGH:**  Don Yarbrough for the plaintiff.

8         **MR. GOLDEN:**  Dale Golden for the defendant.

9         **THE COURT:**  Mr. Golden, you didn't file, I asked you to

10   file a memorandum, or I ordered you to file a memorandum of law,

11   which you didn't do.  Do you have a reason for that?

12        **MR. GOLDEN:**  Confusion.  I'm sorry, your Honor, I was

13   in trial last week.  I had my associate working on this.  My

14   understanding from what he told me, your Honor, is that was what

15   was due after trial and not before trial.  I know that there was

16   an issue with regard to the pretrial stipulation.  I have no

17   excuse, your Honor, other than --

18        **THE COURT:**  -- well, I have the pretrial stipulation,

19   but the order said, the parties shall submit a memorandum on

20   legal issues and pretrial stipulation by Tuesday, October 20th.

21   Then proposed findings of fact and conclusions of law to be

22   submitted by October 28th (phonetic) or shortly after the trial.

23        **MR. GOLDEN:**  I guess that's where my associate's

24   confusion came in.  I'm not putting responsibility on him,

25   because I'm the attorney, your Honor.

1              **THE COURT:**  Okay.  I mean you are in a lawsuit.  I get

2    to read what his trial memo and and didn't get to read one from

3    you so.  Puts you at a little bit of a disadvantage, but I guess

4    you can address it in the proposed findings of facts and

5    conclusions of law.

6              I went through the pretrial stip, I just want to, it

7    showed a bunch of issues, some of which I thought had been

8    resolved.  Is there an issue as to whether or not these messages

9    were left, I'm looking at page four undisposed matters requiring

10   action by the Court.  I'm sorry and following that it says, the

11   following facts will require proof at trial.  Were the

12   defendant's messages were left for emergency purposes as defined

13   in the TCPA.  Do you have some evidence that these are for

14   emergency purposes?

15             **MR. GOLDEN:**  No, your Honor.

16             **THE COURT:**  Okay, so that is not an issue in the case

17   anymore; is that correct?

18             **MR. YARBROUGH:**  Yes, sir.

19             **THE COURT:**  How about whether the defendant used an

20   automatic telephone dialing system or prerecorded or artificial

21   voice to place telephone calls to plaintiff's cell phone?

22             **MR. GOLDEN:**  That is an issue, your Honor.

23             **THE COURT:**  It is an issue.  Okay, what is the issue

24   there?

25             **MR. GOLDEN:**  Specifically what it says, whether or not

1    my client's telephone system meets the definition of an automatic

2    telephone dialing system.

3          **THE COURT:**  What does your client's system do?

4          **MR. GOLDEN:**  There is no evidence in the case regarding

5    that, your Honor.  The other Issue is obviously whether or not

6    there were any prerecorded voice left.  So it is two separate

7    issues.

8          **THE COURT:**  Okay.  How does your company, how do they

9    make these phone calls?

10         **MR. GOLDEN:**  That is what we are here today to

11   determine, your Honor.

12         **THE COURT:**  Okay, nobody has determined that through

13   discovery?

14         **MR. YARBROUGH:**  Yes, we determined that they used an

15   auto dialer.  Their notes reflect that.  However, Mr. Golden just

16   informed me thirty seconds ago, a minute or two ago, that his

17   client is suddenly unavailable.  His corporate representative

18   won't be here to testify in this case.  So that puts us at a

19   significant disadvantage.  We were expecting the defendant to

20   actually show up.  We were told that would be the  witness.  That

21   the witness would be here.  Now, we are told that the witness

22   isn't here.

23         I believe that what Mr. Golden is planning to do is

24   this.  His witness is here, I think, in Miami, in fact very close

25   to the courthouse.  And after we present our case, he is going to

1   move for directed verdict that we haven't shown for example that

2   an auto dialer was used, because we don't have their witness to

3   get that evidence in.

4        Then his witness is going to suddenly appear to testify

5   in his case.  I don't think this case should, I mean I that is a

6   significant disadvantage for a defendant to not even show up.

7   There is nobody here from the defendant's office.

8        **THE COURT:**  I thought you said you have depositions

9   that be admitted into evidence.

10       **MR. YARBROUGH:**  We have the account history notes

11  showing that a dialer was used.  It has a notation dialer,

12  etcetera.  We do not have the deposition testimony of Ms. Johnson

13  or a corporate defendant.

14       **THE COURT:**  Why is that, you didn't depose them?

15       **MR. YARBROUGH:**  Correct.

16       **THE COURT:**  How come the defendant is not here?

17       **MR. GOLDEN:**  Judge, there is no requirement that my

18  client appear for this bench trial.  The fact that he chose not

19  to depose my client --

20       **THE COURT:**  -- I think there is a general requirement

21  that the parties be present at a trial.

22       **MR. GOLDEN:**  There is not, your Honor.  There is plenty

23  of case law that says, the plaintiff doesn't have to be here, the

24  defendant doesn't have to be here.

25       **THE COURT:**  Show me the case law that says that.

1        **MR. GOLDEN:**  I don't have the case law with me, your

2    Honor.

3        **THE COURT:**  I've tried a lot of cases and I've never

4    tried a case that the plaintiff and the defendant weren't there.

5    I would always expect the plaintiff and defendant to be there.

6    The plaintiff listed your client as a witness on the pretrial

7    stip.

8        **MR. YARBROUGH:**  And so did they.

9        **THE COURT:**  So did you and the client is not here.

10       **MR. GOLDEN:**  Judge, it is pretty fundamental there is

11   no requirement --

12       **THE COURT:**  -- look I'm telling you, it is not

13   fundamental.  If it was fundamental, I think I would know it, all

14   right.  I've tried many many cases as a lawyer and I've tried

15   many cases as a Judge and never has there not been a party

16   present.

17       So it sounds to me like what you are trying to do is

18   some kind of, gain some advantage by making it look like you are

19   going to bring your client and then you don't show up with your

20   client.

21       **MR. GOLDEN:**  Judge, I listed a specific individual on

22   my witness list, as did Mr. Yarbrough.  There is no requirement

23   that because I list someone on my witness list, that I call that

24   person at trial.  I don't know whether or not I'm going to call

25   any witnesses at this trial today.

1          **MR. YARBROUGH:**  Your Honor, plaintiff would request a

2   continuance of trial until we have an opportunity to subpoena Ms.

3   Johnson and bring her to this room to testify.

4          **THE COURT:**  I don't think you need to subpoena her to

5   come here, do you?  I'm talking, right.

6          **MR. YARBROUGH:**  Yes, sir.

7          **THE COURT:**  Does your corporate rep need to be

8   subpoenaed to be required to be here?

9          **MR. GOLDEN:**  She needs to be subpoenaed if the

10  plaintiff wants to call someone to the stand, they need to

11  subpoena her absolutely and they didn't do that in this case.

12         **THE COURT:**  And they can't require you to produce that

13  witness?

14         **MR. GOLDEN:**  They can't require me to produce someone

15  who is not under subpoena.

16         **THE COURT:**  Well, I mean you do at depositions, don't

17  you?

18         **MR. GOLDEN:**  That's a different issue.  That's a

19  deposition pursuant to 30(b)(6) which is a corporate

20  representative deposition that compels us under that rule to

21  produce someone for deposition.  It's a totally different issue.

22         **THE COURT:**  Well, any party, not just the 30(b)(6) but

23  any party has to be produced at deposition?

24         **MR. GOLDEN:**  And I agree and Sue Johnson is not a party

25  to this case.  This is a different issue, okay.  This is not a

1    deposition of my client.  This is them listing someone on a

2    witness list for trial and not subpoenaing that witness for

3    trial.

4              Again, all the time in these cases, if they expect to

5    call my client, any person of my client, as a witness in the

6    case, they subpoena that person.

7         **THE COURT:**  Did they talk to you about having the

8    witness here?

9         **MR. GOLDEN:**  No, there was no conversations.  There was

10   people listed on the witness list, but there was never a

11   conversation where we said, Sue Johnson will be here for trial.

12   We never said that.

13        **MR. YARBROUGH:**  Your Honor, I accepted his written

14   representations in the pretrial stipulation that would be his

15   witness, and that she would be here.

16        **MR. GOLDEN:**  It does not say that we are going to have

17   her here at trial.  Judge, I don't know that I need to have her

18   testify here at trial.

19        **THE COURT:**  Okay.

20        **MR. YARBROUGH:**  We need her to testify, your Honor, and

21   we were relying upon her appearance based upon the stipulation,

22   and based upon the idea that it would be extremely odd for a

23   litigant to not show up at a trial.

24        **MR. GOLDEN:**  I just tried a case in May where I didn't

25   have a client.

1      **THE COURT:**  Did you talk to the other party about that

2   beforehand?

3      **MR. GOLDEN:**  Did I talk to the other party about that

4   beforehand?

5      **THE COURT:**  Yes?

6      **MR. GOLDEN:**  No, I did the same thing I did in this

7   case.  There was no specific discussion regarding that issue.

8   There is a list of witnesses, but a list of witnesses is not I

9   will call each and every one of these people.

10      **MR. YARBROUGH:**  Your Honor, it's a trick.  I don't have

11   as much experience as this Court has, but I have never heard of a

12   case where a defendant didn't appear unless they were defaulting.

13   I request the Court allow a continuance for us to subpoena

14   Ms. Johnson and have her here for the trial.

15      **THE COURT:**  What does the defendant say about that?

16      **MR. GOLDEN:**  Your Honor, we are here to try this case.

17   There is no requirement that my client have a physical person

18   here. I'm here representing my client in this case.  Mr.Yarbrough

19   chose not to take my client's deposition, chose not to subpoena

20   any witnesses for trial and now he wants a continuance because he

21   realizes that he needs my client to prove his case in chief.

22      Well, if he needed my client to prove his case in

23   chief, he should have taken a deposition in this case, or he

24   should have subpoenaed someone for trial, and he chose to do

25   neither.

1      **MR. YARBROUGH:**  Your Honor, I chose not to subpoena

2   this witness, because I believed this witness would be appearing.

3   She is the only witness listed by defendant.  She is the only

4   witness advanced in this case.  I was lulled into the belief that

5   Ms. Johnson would be appearing.  She is the Director of

6   Litigation for this firm and she is --

7      **THE COURT:**  -- for the firm?

8      **MR. YARBROUGH:**  For I.C.System for the defendant, she

9   is a Director, I believe it is called Director of Litigation.  I

10  have deposed her in other cases before.  I had no reason at all

11  to doubt the representations on the pretrial stip that the

12  defendant would have Ms. Johnson here.

13        And it's very odd for a case to be proceeding without a

14  party, without a party present in the room, and we are

15  prejudiced.  We are severely prejudiced by it and we are asking

16  for an opportunity to continue the trial to subpoena Ms. Johnson

17  and make certain she is here for the trial.

18      **THE COURT:**  You have some witnesses here, right?

19      **MR. YARBROUGH:**  I have only Mr. Sclafani.

20      **THE COURT:**  Okay, Mr. Sclafani can testify, can't he?

21      **MR. YARBROUGH:**  He cannot prove our case conclusively.

22      **THE COURT:**  No, I'm saying, this is a bench trial.

23  Here is what my ruling is.  You are going to put on the portion

24  of your case that you can today and we will continue the trial

25  until we are able to get -- who is it, Ms. Johnson?

1          **MR. YARBROUGH:**  Yes, sir.

2          **THE COURT:**  What is Ms. Johnson's position with your

3     company?

4          **MR. GOLDEN:**  She works in the legal department of

5     I.C.System.

6          **THE COURT:**  Okay, I'm going to require that you produce

7     her at a future dates.  You don't need to serve a subpoena.  I'm

8     ordering that she be present at whatever date we continue this

9     matter.

10          **MR. YARBROUGH:**  Thank you, your Honor.

11          **THE COURT:**  You can start your trial with an opening

12     statement if you like.

13          **MR. YARBROUGH:**  First preliminarily, Mr. Golden and I

14     have jointly agreed to an exhibit and I move to enter Exhibit

15     No. 1 Joint Exhibit No. 1 into evidence.

16          **THE COURT:**  What is that?

17          **MR. YARBROUGH:**  That's the defendant's response to our

18     request for production, containing the account history notes.

19     They are called account history notes.  There is a listing of all

20     the telephone calls and communications that the defendant and the

21     plaintiff had.  Then at the end there, the last two or three

22     pages or so is a listing of telephone calls that the defendant

23     made to Mr. Sclafani's cell phone.

24          **THE COURT:**  Okay, do you have that?

25          **THE CLERK:**  Judge, I put it up there on the bench for

Page 13

1    you and I gave Maria a copy and I have one.

2         **THE COURT:**  So Plaintiff's Exhibit No. 1 is admitted

3    into evidence.

4         **MR. YARBROUGH:**  Thank you, your Honor.

5         **THE CLERK:**  It's a joint exhibit, Judge.

6         **THE COURT:**  It's a joint exhibit?

7         **MR. YARBROUGH:**  Yes, sir.

8         **THE COURT:**  So it's going to be known as Defendant's

9    Exhibit No. 1 as well?

10        **MR. GOLDEN:**  That's fine.

11        **THE COURT:**  It's Plaintiff's Exhibit No. 1 and

12   Defendant's Exhibit No. 1.

13      (Plaintiff's Exhibit No. 1 and Defendant's Exhibit No. 1

14                    received in evidence.)

15        **MR. YARBROUGH:**  May I proceed?

16        **THE COURT:**  Yes.

17        **MR. YARBROUGH:**  Your Honor, I call --

18        **THE COURT:**  -- I'd like an opening statement if --

19        **MR. YARBROUGH:**  -- I'm sorry, may I use the podium.

20        **THE COURT:**  Sure.

21        **MR. YARBROUGH:**  What the evidence is going to show in

22   this case is that plaintiff Larry Sclafani had incurred a credit

23   card debit with Washington Mutual Bank which is later taken

24   over -- excuse me, with I believe Providian National Bank, it was

25   known as at the time and was later taken over as Washington

1    Mutual Bank, known as Washington Mutual Bank.

2          Because of some financial difficulties he had, he was

3    unable to make the monthly payments and the debt was referred to

4    the defendant I.C. Collection for debt collection.

5          I.C. is a consumer debt collector.  They are one of

6    America's largest consumer debt collectors.  They are in the top

7    twenty debt collectors in America.  They have hundreds and

8    possibly thousands of employees who daily telephone and send mail

9    to consumers all across America attempting to collect debts.

10         Mr. Sclafani received a large number of telephone calls

11   from I.C. System, both on his home phone and on his residence

12   phone.  We are contending that the calls to his cellular phone

13   are a violation of the Telephone Consumer Protection Act, that is

14   the TCPA.  Under the act any business, any person is prohibited

15   from calling a cellular number without the -- using an auto

16   dialer or using a prerecorded message.

17         Our contention is that defendant used both methods to

18   call Mr. Sclafani.  They used an auto dialer and they also used

19   prerecorded messages to telephone him.  They did not have

20   Mr. Sclafani's consent, nor did they call him for emergency

21   purposes.

22         The FCC has been charged by Congress with issuing

23   regulations on the TCPA and in January of '08, the FCC issued an

24   important order.

25         Pardon me, your Honor, I forgot a preliminary matter.

1    I wanted to inform the Court that Mr. Sclafani has a hearing

2    impediment and he has two hearing aids with him.  He is wearing

3    one.  He has two on right now actually.  One appears to be a

4    cellular phone ear piece, but it is not.  It's the latest design

5    that he has just received as a hearing aid, so that when he is

6    out in public, it is not obvious that he has a hearing aid.  It

7    looks like a cell.  The other device you see him holding, that is

8    not a cell phone or a game, that is a hearing aid.  He is hearing

9    impaired.  I'm sorry, I forgot to mention that earlier.

10          **THE COURT:**  Okay.

11          **MR. YARBROUGH:**  So the FCC issued an order in January

12   of '08 setting out the parameters for consumer debt collectors to

13   contact consumers on their cell phones and using an auto dialer

14   or a prerecorded voice.

15          One of the significant things that came out of that

16   ruling is that Congress had said, that unless the consumer

17   explicitly consents to calls on his cell, then the debt collector

18   can't make them.  So that was the language Congress used,

19   explicit consent.

20          But the FCC when it came through in January '08 with

21   its order, it sort of limited that language tremendously.  What

22   the FCC said is, wait a second, we don't care about explicit

23   consent.  Basically they said if the consumer gives his cell

24   phone number to the original creditor, Washington Mutual in this

25   case, then that is consent.  We are going to hold that is consent

1      that allows the debt collector to call the consumer using an auto

2      dialer or using a prerecorded message.

3              So we believe that the defendant is going to attempt to

4      show that Mr. Sclafani consented to the calls that I.C. System

5      made, because he gave his phone number to, his cell phone number

6      to Washington Mutual.  But we are going to show you there isn't

7      any evidence at all that he gave his cell phone number to

8      Washington Mutual.

9              **THE COURT:**  To Washington Mutual or Provident (sic)?

10             **MR. YARBROUGH:**  I'm sorry, I use them interchangeably,

11     your Honor.  I believe the name of the bank was Providian

12     National and it was taken over by Washington Mutual and the

13     documents that are before the Court in Exhibit No. 1 they refer

14     to the bank as Washington Mutual.  So perhaps I should adopt that

15     as the -- the very first page of the notes up at the top I

16     believe, it makes reference to the debt being referred by

17     Washington Mutual.  But they were successor in interest to

18     Providian.

19             **THE COURT:**  So you are not contesting the rules of the

20     FCC, that if the consumer gives his cell phone number to the

21     original debt collector that is considered a waiver of consent?

22             **MR. YARBROUGH:**  No, sir, we are not contesting the law.

23     We are simply saying that he didn't give them the number.  I

24     think the law is contestable, but we are not going to do it

25     today.

1           **THE COURT:**  Okay.

2           **MR. YARBROUGH:**  We have the defendant's notes, they

3      have been produced to us in Exhibit No. 1.  On one of the first

4      pages of those notes, there is a little notation that says --

5           **THE COURT:**  -- you need to step back a little from the

6      microphone.

7           **MR. YARBROUGH:**  Pardon me, your Honor.  There is a

8      little notation on some of those notes that say the total number

9      of calls placed to Mr. Sclafani is something like 548 I believe.

10     Then there are pages and pages and pages of records about the

11     calls.

12           We have analyzed those records and we believe there are

13     approximately forty calls to Mr. Sclafani's cell phone using a

14     prerecorded voice, which violates the TCPA.  The use of a

15     prerecorded voice alone violates.

16           The TCPA prohibits the use of both a prerecorded voice

17     and use of an auto dialer.

18           **THE COURT:**  What makes you think, is it where it says

19     auto voice or what signifies?

20           **MR. YARBROUGH:**  The prerecorded voice, yes, the

21     notation in the records that says, uses the phrase I believe it

22     is auto voice, yes, auto voice.

23           **THE COURT:**  Sometimes it says home auto voice and it

24     says RP auto voice.

25           **MR. YARBROUGH:**  Yes, sir, and sometimes it says ENP

```
 1   auto voice.  Now the ENP auto voice, that number ends in 8383.
 2   That's Mr. Sclafani's cell phone.  The number that is listed in
 3   here as a home number, which is 8555 is Mr. Sclafani's correct
 4   home phone number.  The number listed as RP and that phone number
 5   ends in 1986 is not Mr. Sclafani's number at all, but somebody
 6   else's number.
 7        But the defendant was calling three separate phone
 8   numbers for Mr. Sclafani, his home number which they are
 9   referring to as an employee number, excuse me employer number, a
10   home number which is his home number, and an RP number which is a
11   number that is not his number.
12        THE COURT:  And you believe you should collect damages
13   for the RP number as well?
14        MR. YARBROUGH:  No, sir, we don't, because it's not his
15   number.
16        THE COURT:  You are asking for damages on the cell and
17   the home number?
18        MR. YARBROUGH:  Actually only on the cell, because the
19   FCC has interpreted the TCPA to allow calls to a residence.  The
20   calls to the residence are legally permitted under the current
21   interpretation of the law by the FCC and we are not challenging
22   that.
23        THE COURT:  Okay.
24        MR. YARBROUGH:  So we are not seeking damages on that,
25   only on the cell phone, which the FCC order says is a violation
```

Page 19

1    unless there has been consent.

2         As you through the exhibit here, you can see there has

3    been a very large number of calls, and they are to all three

4    numbers.  There is some calls to each of the numbers.  We are

5    contending these calls to the cell phone violate and defendant

6    also produced --

7         **THE COURT:**  -- which ones.  I see like ENP, no answer.

8    How do you know that's an auto call?

9         **MR. YARBROUGH:**  We would need the testimony of the

10   defendant.  Our contention is this.  That in the debt collection

11   industry, all of these calls are placed with an auto dialer.

12   Some of the notes I can direct the Court's attention to, some of

13   the notes would use codes which indicate a dialer.

14        For example next to the phone number, just to the left

15   of the phone number that is called, you will see on some of the

16   calls, there is a "D" which we believe means dialer.  It is

17   common in the debt collection industry for debt collectors to use

18   auto dialers.

19        In fact there is some evidence that we have just

20   recently seen from the defendant's web page, that they advertise

21   that they use an auto dialer, and we would attempt to introduce

22   that.

23        **THE COURT:**  I don't see anywhere under the ENP, maybe

24   they are here but I haven't had a chance to look at every one.  I

25   saw a bunch that said home, auto voice, RP auto voice.  I don't

1  see any that say ENP auto voice.  ENP dead air.

2      **MR. YARBROUGH:**  Okay, there are some.  There is about

3  forty of the calls, approximately, excuse me there is 38.  If you

4  look through all the calls, there is 38 that show a auto voice to

5  the cell phone.  And we believe that all of these calls, whether

6  they left an automated message or not, that all of them were

7  placed with an auto dialer within the statute.

8      **THE COURT:**  You are obviously going to have to call

9  someone to say that, call someone who is going to interpret

10  these.

11      **MR. YARBROUGH:**  That would be the defendant, that's why

12  we needed her here.

13      **THE COURT:**  Okay.

14      **MR. YARBROUGH:**  So what we are going to do, well, I

15  think we laid it out, your Honor.  Thank you very much.

16      **THE COURT:**  Mr. Golden, do you want to make an opening

17  now or at the beginning of your case?

18      **MR. GOLDEN:**  I will make it now, sir.

19      **THE COURT:**  Okay.  Where is Sue Johnson by the way, is

20  she here in Miami?

21      **MR. GOLDEN:**  I don't know if she is still in Miami or

22  not.  I think she is, yes.

23      **THE COURT:**  Maybe you can call her and get her over

24  here then.

25      **MR. GOLDEN:**  I can try if we want to take a break now

1    or.

2         **THE COURT:**  Give me your opening and we will take a

3    five minute break to see if you can get her here.

4         **MR. GOLDEN:**  In terms of these notes, this is why take

5    a deposition so you don't stand before the Judge and say this is

6    what the notes mean, because he is wrong about what the notes

7    mean.

8         The evidence will show, your Honor, that auto voice

9    means there is an auto voice recording that answers the phone, if

10   it would have been Mr. Sclafani's voicemail introduction.  It

11   doesn't mean that it was an auto dialer.  That's not what it

12   means.  Auto voice doesn't mean that.

13        The other thing he said was that there are all these

14   prerecorded voices, messages, and we know because of X,Y, Z.

15   There were not, there were not and we know that for two reasons,

16   which we will learn.  Number one, this client didn't allow it and

17   number two, if there were, the one thing Mr. Yarbrough was

18   correct about, if there were prerecorded messages that were left,

19   there would be a specific indication in the notes.  So he is

20   completely out of bounds on those two claims.

21        **THE COURT:**  If he can't prove those two things, then he

22   is not successful on his claim here; is that correct?

23        **MR. GOLDEN:**  I think that is correct, your Honor.  The

24   other issue the express consent issue.  The fact of the matter is

25   that this plaintiff will testify that when he opened this

1   account, he doesn't remember how he opened it.  He doesn't

2   remember when he opened it.  He doesn't know if he mailed, he

3   went to an office, or if he did it on the Internet.  He doesn't

4   remember what phone number it was that he gave to Washington

5   Mutual.

6          He will testify that he owns his own business, a

7   painting contractor business, and he uses his cell phone as his

8   business number.  That he doesn't hardly ever give out his home

9   phone number for any reason.  That he has business cards and on

10   the business cards that he had, and I think he testified at

11   deposition he doesn't still have any, that it's his cell phone

12   number that is on his business cards.

13          So it's clear that the cell phone number is

14   Mr. Sclafani's phone number.  That's the one he uses.  That's the

15   one he gives out to people that he is going to do business with.

16          **THE COURT:**  Well, he has a home number, doesn't he?

17          **MR. GOLDEN:**  He does, but his testimony was that he

18   doesn't use that.  His specific testimony on that issue was, I

19   don't use that number much.  I mainly use my cell phone number.

20          The other testimony on that issue will be that my

21   clients got this number from Washington Mutual.  That's the only

22   way they got it.  Now there are certain other ways that debt

23   collectors can get numbers.  There is the skip traces that you

24   can run, people try to track down numbers.  Again, if my client

25   had skip traced this number and found the number through a skip

1    trace, as opposed to getting it from his client, there would be

2    an indication in these notes saying that a skip trace was run and

3    that number was recovered.

4         If this number was gotten from let's say we called

5    Mr. Sclafani's sister and she gave us this number, there would be

6    an indication in the notes that we got it from his sister and

7    then it was input into the notes.  The first page of this exhibit

8    contains all the information at the top here that we received

9    regarding this account, including the phone numbers.  All of that

10   information was received from Washington Mutual.

11        The only conclusion and Mr. Sclafani will testify that

12   he never heard from Washington Mutual after he opened this

13   account, after it went into default.  The only reasonable

14   conclusion, the only logical conclusion to draw, and it only

15   makes sense, he gave that number to Washington Mutual along with

16   the home phone number as part of the application process.

17        As Mr. Yarbrough pointed out, the FCC has held

18   unequivocally that if you provide that number to the creditor,

19   that counts as prior express consent.

20        **THE COURT:**  You agree that you have the burden of proof

21   in that, as an affirmative defense?

22        **MR. GOLDEN:**  Well, it's odd.  I don't mean to

23   equivocate.  The FCC opinion says that the burden is on the

24   creditor to prove prior express consent.  There is an opinion

25   from Judge Dimitrouleas up in Fort Lauderdale that says

Page 24

1    essentially the same thing.  There are other opinions from

2    Circuit Courts that say the burden is on the plaintiff to prove

3    lack of prior express consent.

4         So I don't want to concede that point, but I will tell

5    you what I did tell you.  I'm not going to concede that point.

6    We are going to argue it is his burden, not our burden.  But I

7    recognize, your Honor, that whatever conclusion you draw is

8    supportable based upon case law out there and the FCC opinion.

9    That's all I have.

10        **THE COURT:**  Okay.  Why don't we take five minutes and

11   see if you can get Ms. Johnson here.  Do you have a phone with

12   you?

13        **MR. GOLDEN:**  I do, your Honor.

14        **THE COURT:**  Then we will start with the plaintiff's

15   first witness.

16                    (A brief recess.)

17        **THE COURT:**  All right, call your first witness.  I

18   understand Ms. Johnson is going to be here shortly?

19        **MR. GOLDEN:**  She is.

20        **THE COURT:**  Okay, good.

21        **MR. YARBROUGH:**  Your Honor, plaintiff calls Lawrence

22   Sclafani.

23                    -------------------------------

24   THEREUPON,

25                         LAWRENCE SCLAFANI,

1    a witness of lawful age having been first duly sworn testified on

2    his oath as follows:

3              **THE CLERK:**  State your name into the microphone and

4    spell your last name.

5              **THE WITNESS:**  It's Lawrence Sclafani, S-C-L-A-F-A-N-I.

6                        DIRECT EXAMINATION

7    **BY MR. YARBROUGH:**

8    **Q.**   Larry, did you open up a credit card account with Washington

9    Mutual?

10   **A.**   I had a credit card account with Washington Mutual.  That's

11   better.

12   **Q.**   You can hear better?

13   **A.**   Yeah.

14   **Q.**   Let me know if you have trouble hearing me.  What do you do

15   for a living?

16   **A.**   I'm self-employed painting contractor.

17   **Q.**   So you paint houses?

18   **A.**   I paint houses and sometimes commercial buildings.

19   **Q.**   Do you have any employees who work with you?

20   **A.**   Excuse me?

21   **Q.**   Do you have any employees?

22   **A.**   No, just myself.

23   **Q.**   What happened with the Washington Mutual credit card?  I

24   mean did you come into a time where you had trouble paying?

25   **A.**   Okay, yes.  What happened is I took out the Washington

```
 1    credit card and my wife was going to school for a nursing degree,

 2    a nursing program and work slowed down to almost nothing and it

 3    was hard for me to pay all the bills.  So it was pretty much just

 4    me.  Before then my wife was working for the school board, so it

 5    was like a second income.  But when she started full time at

 6    school for her nursing degree, everything rested on my shoulders.

 7    Q.    So is it fair to say you fell behind in the payments?

 8    A.    I fell behind in the payments with Washington Mutual, yes.

 9    Q.    Did there come a time that you started receiving calls or

10    letters from I.C. System?

11    A.    Was there a time that I started, yes, there was.

12    Q.    Now, did you receive calls from I.C. System on your cell?

13    A.    Yes, I did.

14    Q.    What is your cell number?

15    A.    954-305-8383.

16    Q.    Is that the number that I.C. System called you?

17    A.    Yes.

18    Q.    Did you ever give that number to Washington Mutual?

19    A.    No.

20    Q.    Did you ever tell I.C. System to stop calling you?

21    A.    Yes.

22    Q.    Tell us about that.

23          THE COURT:  When you say Washington Mutual, wasn't the

24    credit card --

25          MR. YARBROUGH:  -- I'm sorry, pardon me, your Honor, I
```

1    misspoke.  I misspoke, excuse me.

2    **BY MR. YARBROUGH:**

3    **Q.**   Did you ever tell I.C. System to stop calling you?

4    **A.**   Yes, I did.

5    **Q.**   How did that come about?

6           **THE COURT:**  Wait, wait, let's go back.  You're asking

7    him did he ever give the number to -- you're asking him about

8    Washington Mutual.  You told me in opening that he actually got

9    this card from a different company called Provincial or

10   something?

11          **MR. YARBROUGH:**  Providian was the predecessor of

12   Washington Mutual.  I may have misspoke.  A lot of the Providian

13   accounts, what happened is Providian I believe went under and the

14   accounts went to Washington Mutual.  I might have misspoken.

15          **THE COURT:**  You need to clarify with him who he got the

16   credit card from and if he gave that entity the number, because

17   that's the issue I think.

18          **MR. YARBROUGH:**  Pardon me, your Honor, let me go back

19   and correct that.

20   **BY MR. YARBROUGH:**

21   **Q.**   Larry, can you tell us who the credit card was opened with,

22   what company?

23   **A.**   I'm sorry, say that one more time.

24   **Q.**   When you got the credit card, who was the company you had

25   the credit card with, what was their name?

1   **A.**   Washington, the credit card was issued with Washington

2   Mutual.

3   **Q.**   So you never had any dealings with Providian?

4   **A.**   I don't believe so, no.

5   **Q.**   Okay, I misspoke, pardon me.  So the card was originally

6   issued with Washington Mutual?

7   **A.**   Yes.

8   **Q.**   Can you recall now roughly when you got the credit card with

9   Washington Mutual?

10  **A.**   December of '06.  I remember I found the card and it said

11  active December '06.

12  **Q.**   So when you got the card with Washington Mutual, did you

13  give Washington Mutual your cell phone number?

14  **A.**   No.

15  **Q.**   How can you be sure you didn't give it to them?

16  **A.**   I'm positive I didn't give it to them, because I did not

17  receive my cell phone until July '07, July 29th, '07.

18  **Q.**   How can you say when you got the cell phone?

19  **A.**   Based upon when we did the deposition, I started thinking

20  that I didn't have that cell phone that long.  So called the day

21  after we left the deposition, I called the cell phone company

22  T-Mobile and I asked them when my start date was and they told

23  me.  I thought he might have made a mistake, so I called again

24  and a separate person told me the same thing July 29th, '07.

25  **Q.**   So at the time you took out the credit card, you didn't have

1  your cell number that ends in 8383?

2  **A.**   No, sir.

3  **Q.**   Any time after you got the Washington Mutual card, the whole

4  time you had it, did you ever give them the cell number that ends

5  in 8383?

6  **A.**   No, sir.

7  **Q.**   Did you give them your home number, did you give Washington

8  Mutual your home phone number?

9  **A.**   Yes, mostly likely, yes.

10  **Q.**   What was that number?

11  **A.**   954-587-8455.

12  **Q.**   Now when you started getting --

13  well, let's go to the calls that you got from I.C. System, can

14  you tell us about how many calls you got from them?

15  **A.**   From I.C.System I received at least one or two a day for

16  months at a time.

17  **Q.**   Did you receive calls every single day?

18  **A.**   Almost every single day, yes.

19  **Q.**   Did you ever have an occasion -- are there any of the calls

20  that you can particularly remember?

21  **A.**   There was was one particular call in which I told them not

22  to call and --

23  **Q.**   How did that come about?

24  **A.**   Well, actually I was on a roof painting and it was like

25  ninety degrees out and I was up on a roof trying to get the roof

1    finished up and was looking for the rain coming in etcetera and

2    they called.  I guess out of frustration I cussed them out and

3    told them not to ever call me again.

4           **MR. YARBROUGH:**  Your Honor, I believe Mr. Sclafani is

5    too close to the microphone.

6           **THE CLERK:**  He can move it back or sit back.

7           **MR. YARBROUGH:**  If you hear like a booming sound coming

8    through that means you got too close to the microphone.

9    **BY MR. YARBROUGH:**

10   **Q.**   So you were telling us that you remember one call where you

11   were up on a roof?

12   **A.**   Right.

13   **Q.**   You were painting?

14   **A.**   I was painting, actually I was up on the roof painting a

15   retaining wall and I was trying to get that finished before the

16   rain came in and they called again.  Prior to that I had told

17   them not to call me again.  So when they called this other time,

18   I told them never to call my cell phone again and I cussed them

19   out.

20   **Q.**   When you told them not to call you, were you up on the roof?

21   **A.**   Yes, sir.

22   **Q.**   Did you say you had told them before that not to call you?

23   **A.**   Yes, I did.

24   **Q.**   That same day?

25   **A.**   No, it was prior to that.

1  **Q.**   It wasn't the same day?

2  **A.**   No.

3  **Q.**   Do you recall the date of that?

4  **A.**   It was probably a couple days before then.

5  **Q.**   Do you remember, were there any of the other calls that you

6  can particularly recall?

7  **A.**   Yes, I remember one call on Christmas Day.

8  **Q.**   Why do you remember that call?

9  **A.**   Because it was Christmas Day and I was with my family they

10  called me on my cell phone.

11  **Q.**   The calls that you received on your cell phone, were those

12  calls, could you tell if those calls were humans speaking or if

13  they were prerecorded or were they both?

14  **A.**   You could pretty much tell, a lot of them were prerecorded,

15  robot type calls.

16  **Q.**   How did you know they were robot type calls?

17  **A.**   You could pretty much tell, well, they were the same first

18  of all.

19  **Q.**   They were the same?

20  **A.**   Some of the calls after were the same, but the robot calls

21  everything is concise and there is no hesitation.  When you speak

22  to a regular person, there is a pause, they say uh, or go off the

23  trail a little bit, but all those calls that came in were the

24  same, the same.

25  **Q.**   Can you give us, you didn't keep any records of how many

1  calls you got, did you?

2  **A.**   No, I didn't keep a record.  They kept calling.  After

3  listening to the message and it was them, I got home and there

4  would be a message at the home, etcetera, etcetera, just

5  continuous, probably about off the top of my head about forty or

6  fifty or so.

7  **Q.**   Forty or fifty calls to your cell or to your home?

8  **A.**   To my cell.

9       **THE COURT:**  Let me interrupt.  You said you spoke to

10  someone and told them not to call you, was that a robot you were

11  talking to or was that?

12       **THE WITNESS:**  No, sir that was an actual voice.

13       **THE COURT:**  Okay.

14       **THE WITNESS:**  If I picked up on the robot calls, then a

15  voice would interrupt and after that I let it go to voicemail

16  because it was the same thing.  It became redundant to tell them,

17  not to call first of all.  Second of all, I didn't have the money

18  to do anything.  I've read your letters and as soon as I can get

19  something up I will send it to you, etcetera, etcetera.

20  **BY MR. YARBROUGH:**

21  **Q.**   Let me understand what you mean by a robot call.  Did you

22  receive messages where you played your voicemail and you heard a

23  tape recording of the message that I.C. System left for you?

24  **A.**   Right.

25  **Q.**   Did you do that?

1    **A.**    Yes.

2    **Q.**    When you say it's a robot call, that's what you mean it's

3    a --

4    **A.**    -- yeah, right, I call it robot.

5    **Q.**    Okay, was the call prerecorded the time we are talking

6    about?

7    **A.**    Yes, because it was the same call that I would get today as

8    I would get the day before.  Ever so often it would change with a

9    different name, but it would be the same.

10   **Q.**    Did you receive calls where a voice came on, a prerecorded

11   voice and told you to hold for a human?  Do you remember if you

12   received that type of call?

13   **A.**    No, it wasn't a hold, it was please call I.C.System.

14   **Q.**    Okay, so it would be a prerecorded voice, it wouldn't be a

15   human talking, but you could hear what they were saying?

16   **A.**    Right.

17   **Q.**    At times you would pick that up and listen to that?

18   **A.**    Right.

19   **Q.**    Okay, but some of the messages just went to your voicemail?

20          **MR. GOLDEN:**  Objection, your Honor, leading.

21          **THE COURT:**  Sustained.

22   **BY MR. YARBROUGH:**

23   **Q.**    Larry, did you receive calls from I.C.System where a human

24   was talking?

25   **A.**    Yes.

Page 34

1  **Q.**  Now as far as the calls from I.C. System that used a

2  prerecorded voice, can you give me an estimate of how many of

3  those calls you received?

4  **A.**  About fifty, sixty, something like that.  That was over a

5  period of time.

6          **THE COURT:**  Move a little closer to the microphone

7  please.

8          **THE WITNESS:**  I'm sorry.

9          **THE COURT:**  Pull the mike a little closer to you.  You

10 got a little too far away there.  Somewhere in between, you have

11 to find the right spot.

12         **MR. YARBROUGH:**  If you get too close, we get the

13 booming sound.  If you get too far away, then we can't hear you.

14 **BY MR. YARBROUGH:**

15 **Q.**  Larry, what again is your cell phone number?

16 **A.**  954-305-8383.

17 **Q.**  What is the phone number at your home?

18 **A.**  Right now the phone number that I.C.System called?

19 **Q.**  Yes?

20 **A.**  That was 954-587-8455.

21 **Q.**  How long have you had that home number?

22 **A.**  That home number I've had for a long time.

23 **Q.**  Like how long?

24 **A.**  About three years, four years.

25 **Q.**  It was before you got the Washington Mutual card?

1   **A.**   Right.

2   **Q.**   Do you recognize the phone number 954-587-1986?

3   **A.**   That number sounds almost familiar, but it's not my home

4   number. It could have been, maybe about six or seven years ago,

5   my daughter I think we got her a phone for her room, but that was

6   only for a few months, because we dropped that.  I don't know

7   whether that was the number or not.  I can't be certain, but we

8   did have a separate line.

9   **Q.**   In your home?

10  **A.**   In the home, but it was only for a short period of time,

11  months, just for a few months and that was six, seven, eight

12  years ago.

13  **Q.**   Can you recall was there more than one occasion that you

14  asked I.C.System to stop calling you?

15  **A.**   Yes.  I remember the once on the roof I cussed them out a

16  few days prior to that.

17  **Q.**   Is it two?

18  **A.**   I didn't speak to them at Christmas.  In a conversation

19  probably with one of their spokespersons, I know I told them then

20  too, yes.

21  **Q.**   Did you ever give Washington Mutual permission to call you

22  on your cell phone?

23  **A.**   No.

24  **Q.**   Did you ever give them the cell phone number?

25  **A.**   No.

1          **MR. YARBROUGH:**  Your witness.

2          **THE COURT:**  Cross examination?

3                     CROSS EXAMINATION

4    **BY MR. GOLDEN:**

5    **Q.**   Good morning, Mr. Sclafani.  You don't remember when you

6    opened the account, do you?

7    **A.**   12/06 that's the time said on the card.

8    **Q.**   You remember having your deposition taken in this case,

9    don't you?

10   **A.**   Yes, I do.

11   **Q.**   You remember being asked that same question at deposition,

12   don't you?

13   **A.**   When I opened the card?

14   **Q.**   Yes?

15   **A.**   Yes, at that time I didn't know.

16   **Q.**   At page seven, line twenty the following question was asked.

17   Question:  Do you remember when you opened that account.  Answer:

18   No.

19   **A.**   That might have been correct at that time.  But after I left

20   the deposition, I went home and I searched for the card and I

21   found the card and it said, 12/06 and then I started thinking

22   about the cell phone thing.  Because I did go over the deposition

23   in my head and that's what brought me to that.

24   **Q.**   So after deposition the, you did an investigation to

25   determine if your answers were accurate?

Page 37

1   **A.**   Excuse me, say that last part.

2   **Q.**   After the deposition, you did an investigation to determine

3   whether or not the answers you gave at the deposition were --

4   **A.**   -- no, it wasn't a specific thing.  I was just looking for

5   the card.

6   **Q.**   Mr. Sclafani, you need to wait until I answer my question,

7   or ask my question before you answer.  You remember at deposition

8   you raised your right hand and swore to tell the truth, right?

9   **A.**   Yes, I did.

10  **Q.**   Just like you did today, right?

11  **A.**   Yes, I did.

12  **Q.**   At deposition you said you didn't remember when you opened

13  this account?

14  **A.**   That was correct at that time.

15  **Q.**   Then after your deposition you did some sort of

16  investigation that led you to another conclusion, correct?

17  **A.**   I wouldn't call it an investigation.

18  **Q.**   What would you call it?

19  **A.**   Looking for the card.

20  **Q.**   Could you have looked for the card before the deposition?

21  **A.**   No, because I wasn't concerned was.

22  **Q.**   You weren't concerned?

23  **A.**   The actual date of the card, no, I wasn't.

24  **Q.**   Certainly after you found out that your answer in deposition

25  was inaccurate, you contacted the court reporter and made sure

1    that whether you could correct your deposition testimony, right?

2    **A.**    No, no, no.

3    **Q.**    You didn't do that?

4    **A.**    I didn't think of that specific question as to why I was

5    looking for the card.  The only reason I was looking for the card

6    was out of curiosity as to when I opened the account.

7    **Q.**    Just so we are clear, there is absolutely nothing that would

8    have prevented you from doing that before your deposition,

9    correct?

10   **A.**    I don't understand the question.

11   **Q.**    You could have looked for the card before your deposition,

12   but you chose not to; isn't that true, sir?

13   **A.**    Yes.

14   **Q.**    And you don't remember, sir, how you opened this account, do

15   you?

16   **A.**    Not specifically, no.

17   **Q.**    You don't know if it was through the mail?

18   **A.**    I could have been.  Could have been only two possibilities.

19   It could have been through the mail or through the Internet, but

20   most likely it was the mail.

21   **Q.**    But you don't remember, do you?

22   **A.**    No.

23   **Q.**    You don't have a specific recollection of sitting down and

24   filling out an application?

25   **A.**    Well, yes, I remember, because I got the card.

1   **Q.**   But do you remember sitting at the table and filling out a

2   Providian or Washington Mutual application in December 2006?

3   **A.**   No, I wouldn't think so, no.

4   **Q.**   You don't remember going on the Internet and doing that, do

5   you, sir?

6   **A.**   Prior to that I tried to obtain some credit cards, so that's

7   why I'm so confused with your question, because specifically for

8   that particular card, I wouldn't know whether I tried to get a

9   card on the Internet or through the mail.  So I don't know,

10  that's where the confusion lies.  It wasn't specifically a

11  Washington Mutual card that I was applying for.  There could have

12  been two or three others beforehand, because I didn't have a

13  credit card at that time.

14  **Q.**   Right, all I'm saying is you don't remember, right, it was a

15  while ago, right, you don't remember?

16  **A.**   Would have been only two possibilities.

17  **Q.**   You, sir, don't remember what phone number you gave as part

18  of the application process, do you?

19  **A.**   The only phone number I could have gave at that time was my

20  home number.

21  **Q.**   Sir, you don't recall -- and, your Honor, if I could get an

22  answer to my question.  The question was:  You don't recall what

23  phone number you gave as part of that application process?

24          **THE COURT:**  Do you recall?

25          **THE WITNESS:**  It would have to be my home phone number,

Page 40

1    it wouldn't have been my cell phone.

2    **BY MR. GOLDEN:**

3    **Q.**   Now, I asked you that same question at your deposition,

4    didn't I?

5    **A.**   Did you?

6    **Q.**   Page eighteen, line fourteen:  Question:  What number did

7    you give Washington Mutual?  Answer:  I couldn't recall.  So your

8    testimony at deposition was, you don't remember what number you

9    gave as part of that application process?

10   **A.**   At that time, right.

11   **Q.**   But now you remember after?

12   **A.**   I didn't have a revelation as to I remember that as now, but

13   maybe you jogged my memory so that I'm thinking about it, but the

14   only possible number that I could have given was my home number.

15   I don't typically give out a cell phone number.

16   **Q.**   Because it's your testimony today, you didn't even get the

17   cell phone number until after you had this account; isn't that

18   true, sir?

19   **A.**   Rephrase that, say that one more time.

20   **Q.**   Your testimony today is that you didn't even get that cell

21   phone number until after you opened this account.  That's what

22   you said today, right?

23   **A.**   Right, July '07.

24   **Q.**   Again, that's not what you said at deposition, is it, sir?

25   **A.**   What do you mean that's not what I said at deposition?

Page 41

1  **Q.**   That's not what your testimony was at your deposition in

2  June of  this year?

3         **MR. YARBROUGH:**  Objection, misstating the evidence, he

4  didn't ask that question.

5         **THE COURT:**  You can read him the question you asked

6  him.

7  **BY MR. GOLDEN:**

8  **Q.**   Mr. Sclafani, you own your own business, don't you?

9  **A.**   Yes, I do.

10 **Q.**   You use your cell phone number as your business number,

11 don't you?

12 **A.**   Yes.

13 **Q.**   You have had business cards for your business, haven't you?

14 **A.**   Yes.

15 **Q.**   And you had your cell phone number on your business cards,

16 don't you?

17 **A.**   Yes.

18 **Q.**   You have a home phone, don't you?

19 **A.**   Yes.

20 **Q.**   You don't use that home phone number much, do you?

21 **A.**   Today I don't.

22 **Q.**   You mainly use your cell phone, don't you, sir?

23 **A.**   Today, I do, yes, back then I didn't.

24 **Q.**   Back then you didn't?

25 **A.**   Right.

Page 42

1   **Q.**   Because you didn't get the cell phone number until after

2   this account was opened, right, that's your testimony today?

3   **A.**   That was the testimony pertaining to that cell phone.  But

4   typically I didn't use my cell phone for everyday usage.  I would

5   use it for my friends and things like that, business to get jobs

6   with, on my business I would give it to a contractor and stuff.

7   But typically I wouldn't give it out to anybody, mainly for

8   various reasons.

9   **Q.**   In th complaint, sir, which you filed against my client,

10  there are four different dates of messages left, are you aware of

11  that?

12  **A.**   Yes.

13  **Q.**   The first one is on January 3rd, 2008, do you remember what

14  the message was?

15  **A.**   No.

16         **MR. GOLDEN:**  Let me see -- may I approach to give him a

17  copy of this, your Honor?

18         **THE COURT:**  Sure.

19  **BY MR. GOLDEN:**

20  **Q.**   The one on January 3, 2008 do you see that one?

21  **A.**   I see that one, yes.

22  **Q.**   Is it your testimony in court today that was a prerecorded

23  messages that was left on your voicemail, on your cell phone?

24  **A.**   Yes.

25         **THE COURT:**  I'm sorry, what are you showing him now?

1          **MR. GOLDEN:**  The complaint, sir.

2          **THE COURT:**  Okay.

3     BY MR. GOLDEN:

4     Q.   So this January 3, 2008 message which says:  This message is

5     for Larry Sclafani.  If you are not Larry Sclafani, please hang

6     up or disconnect.  If you are Larry Sclafani, please continue

7     listening to this message.  This is Semetra (phonetic) from

8     I.C.System.  Please contact me regarding a personal business

9     matter at 1-866-903-1001.  Again, that is 1-866-903-1001

10    regarding a personal business matter.  Thank  you.  Did I read

11    that correctly, sir?

12    A.   That's correct.

13    Q.   And it is your testimony today that was what you called a

14    robot voice as opposed to a real person?

15    A.   Yes.

16    Q.   The second message January 31, 2008 do you see that one?

17    A.   Yes.

18    Q.   That one says:  Hello, this is I.C.S. calling for Larry

19    Sclafani.  Please call us back at 1-800-561-5695 in regards to a

20    very important business matter of yours.  Again, the  number is

21    800-561-5695.  Thank you.

22         Is it your testimony today in court, sir, that also was what

23    you called a robot voice?

24    A.   I would have to hear the voice, but I would think -- I would

25    have to hear the voice.

Page 44

1    **Q.**   So you don't know?

2            **MR. YARBROUGH:**  Objection, speculation.

3            **THE WITNESS:**  It sounds like a robot.

4            **THE COURT:**  Objection is overruled.

5    **BY MR. GOLDEN:**

6    **Q.**   It sounds like a robot voice when I read it?

7    **A.**   Yeah, when you read it, yes.

8    **Q.**   Now there is one for February 1, 2008 do you see that one?

9    **A.**   Yes.

10   **Q.**   It says:  Good morning.  This is Nancy.  Please have Larry

11   Sclafani call me at 1-800-561-5695 regarding a personal matter.

12   Again, the telephone number is 1-800-561-5695.  Thank you, bye.

13        It is your testimony here in open court today, that too is

14   what you called a robotic voice?

15   **A.**   I would have to hear the voice, like I said, Mr. Golden, I

16   would have to hear the voice.  Like I said pretty much it sounds

17   like it would be a robot call.

18   **Q.**   It sounds like it, or when I read it, it sounds like it?

19   You don't recall, do you, sir?

20   **A.**   I would have to hear it again.  The way it is written and

21   the way it sounds when I hear it on the voicemail is completely

22   different, but there is a distinction between the two, a definite

23   distinction.

24   **Q.**   These calls, these three calls, and we will get to the

25   fourth one in a minute, did keep them?

1    **A.**    I'm sorry, say that again.

2    **Q.**    Did you keep those recordings?

3    **A.**    Did I keep those recordings?

4    **Q.**    Yes?

5    **A.**    Yeah, some of the voicemails I kept, yes.

6    **Q.**    How did they end up here in this complaint, do you know?

7    **A.**    How did they end up in this complaint?

8    **Q.**    Yes?

9              **MR. YARBROUGH:**   Objection, your Honor, it's irrelevant

10   how they ended up in the complaint.   The parties have stipulated

11   that those calls were placed.   That the defendant made those

12   calls.   It's in our pretrial stipulation.

13             **MR. GOLDEN:**   I think I will make my point here in about

14   a minute.

15             **THE COURT:**   The objection is overruled.

16   BY MR. GOLDEN:

17   **Q.**    The reason they are here in the complaint is because you

18   gave those to your attorney, didn't you, in some form, right?

19   **A.**    Yes.

20   **Q.**    Your attorney has these recordings, doesn't he?

21   **A.**    Yes, he does.

22   **Q.**    And you can't tell whether or not these are prerecords,

23   these are robot voices or a live person, because you are not

24   listening to those, are you?   If I played it for me, you could

25   tell me, right?

1   **A.**   Could you repeat that?

2   **Q.**   If I played it for you, you could tell me, right?

3   **A.**   Probably, yes.

4   **Q.**   The last message February 7th, 2008 do you see that one?

5   **A.**   Yes.

6   **Q.**   It says:  This message is for Larry.  Larry, this is NIck

7   calling on behalf of a very important business matter.  Give me a

8   call back as soon as you get this message at 1-800-561-5695 and

9   we will be able to help you from there.  Thank you.

10   **A.**   Mr. Golden, am I pronouncing that right, Mr. Golden, the

11   tone of your voice when you just relayed that to me is what I

12   would be able to determine whether it was a robot call.  Your

13   voice goes up high and it goes low on certain words.  A robot

14   call would be a monotone call.

15        When you read these to me, as they are on this paper, you

16   are emphasizing certain words and stuff like that.   Whereas a

17   robot call has a certain monotone call.   So looking at this

18   paper, the way it sounds, it would sound like a robot call,

19   unless I heard it differently.

20   **Q.**   Again, the best way for us to really know is to listen to

21   those recordings?

22   **A.**   Listen to the recordings.

23   **Q.**   Now each one of these messages, these four messages that we

24   have gone through was left my a different person, wasn't it?  It

25   was a different speaker with each one of them, wasn't it, sir?

Page 47

1    **A.**   Yes, sir, it indicates that.

2            **MR. YARBROUGH:**  Pardon me, your Honor, I overlooked

3    something.  Ms. Johnson's presence during Mr. Sclafani's

4    testimony, I think is improper.  She is going to be testifying.

5    I would ask to invoke the rule that she be sequestered and not

6    allowed to listen to his testimony further.

7            **THE COURT:**  Okay, what do you say?

8            **MR. GOLDEN:**  Judge, he was complaining that she wasn't

9    here and now he is complaining that she is.  She is the corporate

10   representative.  The defendant has a right to be present here in

11   the courtroom.

12           **THE COURT:**  I think a Rule 615 you are allowed to have

13   a corporate representative here.

14           **MR. YARBROUGH:**  I think he is too, but I believe there

15   is a rule that she is not allowed, another witness is not allowed

16   to listen to the other witness, the opposing witness's testimony.

17           **THE COURT:**  Sure under the rule of sequestration,

18   except there is an exception for the parties, such as Mr.

19   Sclafani can be here throughout the case, as well as a

20   representative of the corporate party.  So I'm not going to have

21   her sequestered.

22           **MR. YARBROUGH:**  Thank you, your Honor.

23           **MR. GOLDEN:**  Thank you, your Honor.

24   BY MR. GOLDEN:

25   **Q.**   Now, these four messages that we talked about, you, sir,

1   don't recall I.C.System leaving any other messages on your cell

2   phone than those four messages, do you, sir?

3   **A.**   Other than these four messages?

4   **Q.**   Correct, sir?

5   **A.**   Oh, yes, I do, they left other messages before.

6   **Q.**   Let me go back to your deposition again, sir.  Page

7   twenty-one beginning at line nine.  Question:  Now other than

8   these four messages that are here in the complaint, were there

9   other messages left on your cell phone?  Answer:  Other than

10   those messages?  Question:  Yes?  Answer:  From I.C.System?

11   Question:  Yes, thanks for clarifying my question.  Answer:  I

12   couldn't, you know this is 2008, I couldn't recall that.  That

13   was your testimony at deposition?

14   **A.**   Okay.

15   **Q.**   Your testimony today, is, oh, yes, I do recall other phone

16   calls. Is that accurate, sir?

17   **A.**   Well, the fact that they left so many messages, wouldn't you

18   think that they did call my cell phone.  I wasn't going through a

19   lapse of memory at the deposition.

20   **Q.**   No, you weren't.  I don't believe for a second that your

21   memory at your deposition was in any way inaccurate, sir.  Thank

22   you.

23          **THE COURT:**  Okay, any redirect?

24          **MR. YARBROUGH:**  Yes, sir.

25               REDIRECT EXAMINATION

 1   BY MR. YARBROUGH:

 2   Q.   Mr. Sclafani, at your deposition I think Mr. Golden just

 3   took something out of context to make it look like you said

 4   something that you didn't really say.  Do you recall on page

 5   twenty-eight of your deposition at lines two on, do you recall me

 6   asking you this question.  Question:  Now you mentioned that you

 7   had some tape recordings of some of the calls, and it wasn't

 8   clear to me when you were talking before, do you recall receiving

 9   other messages than the tape recorded recordings that you have,

10   right?  Your Answer:  Yes.

11   A.   Yes.

12   Q.   My next question was:  Question:  They called you other

13   times.  Answer:  Right.

14   A.   Right.

15        MR. GOLDEN:  Your Honor, I'm going to object to this

16   line, because this doesn't say anything about messages on his

17   cell phone and that's specifically what we are talking about.

18   This question from Mr. Yarbrough to his client is a general

19   question about other calls and other messages.  So it isn't

20   contrary to his earlier testimony at deposition.

21        THE COURT:  What do you have to say about that,

22   Mr. Yarbrough?

23        MR. YARBROUGH:  It's absolutely.  If you look down --

24   oh, I'm sorry, your Honor, you don't have the transcript, but if

25   you look down at line twenty-one it says:  Question:  And those

1    messages were left on your cell phone.  I asked him and he said,

2    yes.

3         They are leaving messages, he is clarifying his earlier

4    testimony.

5         **THE COURT:**  Objection is overruled.

6    **BY MR. YARBROUGH:**

7    **Q.**   Larry, do you remember me asking you this question:

8    Question:  And those, in some of the calls that you received from

9    I.C.System, you would have received like the ones that you have

10   tape recordings. Then I say, excuse me, let me start again.

11   Besides the calls that you have the tape recordings on,

12   I.C.System left other messages as well; is that correct?

13   **A.**   That is correct.

14   **Q.**   And you said yes at your deposition?

15   **A.**   Right.

16   **Q.**   The next question I asked you at line eighteen was:

17   Question:  Did you listen to those messages on your cell.

18   Answer:  Yes.

19   **A.**   Yes.

20   **Q.**   Line twenty-three I said:  Question:  Were they left on your

21   cell phone after you told I.C.System to stop calling you and you

22   said yes.

23   **A.**   Yes.

24   **Q.**   The next question up at the top of twenty-nine I said:

25   Question:  When you listened to those messages, did you ever

1   notice that some of the messages sounded like they were recorded,

2   as opposed to whether they sounded like they were live people

3   taking when you listened to the messages?  You said yes?

4   **A.**   Yes.

5   **Q.**   Then I asked you to tell me in your own words -- Larry, so

6   when you say you received prerecorded messages from I.C.System,

7   you're going solely on what you hear in that message.  Am I

8   understanding your correctly?

9   **A.**   Yes.

10  **Q.**   So from Mr. Golden reading the paper or from you reading the

11  paper, you can't tell if the messages are prerecorded?

12          **MR. GOLDEN:**  Objection, leading, your Honor.

13          **THE COURT:**  Sustained.

14          **THE WITNESS:**  I think I already explained that to

15  Mr. Golden.

16          **THE COURT:**  Hold on, there is no question pending.

17  **BY MR. YARBROUGH:**

18  **Q.**   Before you had your deposition, did you know that it was

19  going to make a difference in this case if you gave your cell

20  phone number to Washington Mutual or not?

21  **A.**   No.

22  **Q.**   You didn't know at all?

23  **A.**   No.

24  **Q.**   What did you understand was the reason you were suing them?

25  Let me put it this way.  Why did you sue I.C.System, in your own

1  words.

2  **A.**   For harassment.  Like I said they kept on calling every day,

3  every day, every day, and it just got to the point where I

4  thought there must be a law against this.  Even when I talked to

5  them and told them the financial situation is bad, etcetera,

6  etcetera, and then when I told them to stop calling and they

7  would continue to call.  Then when I told them, I received your

8  letters.  I will act upon the letters when I have a chance,

9  etcetera, etcetera, they continued to call afterwards to the

10  point where I just got to the breaking point.

11  **Q.**   Did you feel that it didn't make any difference what you

12  said to them?

13  **A.**   No, it didn't make a difference what I said to them.  They

14  just went right back to the same thing, the same type of call

15  after I can tell them what I needed to tell them.  Then they

16  would call the following day or two days later and act like

17  nothing was there.  It was like you owe this money, when are you

18  going to pay it, can you send out something etcetera, etcetera,

19  etcetera.

20  **Q.**   When you had your deposition, did you have a vague memory --

21  excuse me, let me put it this way.  When you had your deposition,

22  you didn't specifically recall when you got the credit card; is

23  that correct?

24          **MR. GOLDEN:**  Objection, leading.

25          **THE WITNESS:**  Correct.

1    **THE COURT:**  Sustained.

2    **BY MR. YARBROUGH:**

3    **Q.**   After you had your deposition, excuse me, what made you,

4    after you had your deposition try to find out when you got your

5    cell phone and when you got the Washington Mutual card?

6    **A.**   The curiosity of it all, and the fact that I thought for

7    sure, I knew I had the cell phone for a period of time, and I was

8    just trying to figure out when I got the cell phone and when I

9    got the card, because they kept on dwelling on that.  I just

10   didn't understand.

11   **Q.**   When you say they kept on dwelling on that?

12   **A.**   Mr. Golden kept on asking about that.  I said, wait a minute

13   something is not right here.

14   **Q.**   But at that time you didn't even understand?

15   **A.**   No, it never dawned on me that was pertinent to anything.

16   **Q.**   You just wanted them to stop calling you?

17   **A.**   Yeah, I just wanted them to stop calling.

18   **Q.**   You mentioned that you use your cell phone for business.

19   Could you tell us what you mean by using it for business, why is

20   it important to use it?

21   **A.**   I give my cell phone out to like contractors, because they

22   have a turnover of jobs.  Sometimes, most times if you don't act

23   upon the job right away, you lose the job because they have given

24   it to somebody else.  That type of thing.  So I always want to

25   make sure they have my cell phone, so that they can contact me

Page 54

1    directly with job offers.

2    **Q.**   So the reason you give your cell number to --

3          **THE COURT:**  This is leading, because I think he has

4    already answered the question.  You don't need to repeat

5    something.

6          **MR. YARBROUGH:**  I'm sorry.

7    **BY MR. YARBROUGH:**

8    **Q.**   When you say contractors, you are talking about general or

9    other --

10   **A.**   -- general contractors or property managers, somebody I know

11   that would have jobs.

12   **Q.**   That would give you work.  So that's the urgency of the cell

13   phone?

14   **A.**   Right, and emergency purposes for family, like anybody else.

15         **MR. YARBROUGH:**  Okay, no further questions, thank you.

16         **THE COURT:**  Thank you, sir, you may step down.  Any

17   further witnesses for the plaintiff?

18         **MR. YARBROUGH:**  Yes, we would call Susan Johnson.

19                 ------------------------------

20   THEREUPON,

21                      SUSAN ELIZABETH JOHNSON,

22   a witness of lawful age having been first duly sworn testified on

23   her oath as follows:

24         **THE CLERK:**  State your full name and spell it for the

25   record.

1        **THE WITNESS:**  Susan Elizabeth Johnson, S-U-S-A-N,

2   E-L-I-Z-A-B-E-T-H, J-O-H-N-S-O-N.

3                        DIRECT EXAMINATION

4   **BY MR. YARBROUGH:**

5   **Q.**   Ms. Johnson, what is your job position at I.C.System?

6   **A.**   Director of Legal Affairs.

7   **Q.**   How long have you had that position?

8   **A.**   A little over two years.

9   **Q.**   Before that were you employed with I.C.System?

10  **A.**   Yes.

11  **Q.**   In what capacity?

12  **A.**   Manager of Legal Affairs.

13  **Q.**   Did your duties change when you changed positions?

14  **A.**   No.

15  **Q.**   So just your title changed?

16  **A.**   Right, it was a promotion.

17  **Q.**   How long had you been employed in the two different

18  positions at I.C.System total?

19  **A.**   Six and a half years.

20  **Q.**   How long have you been employed with I.C.System in total?

21  **A.**   Almost thirty-one years.

22  **Q.**   What age were you when you started with I.C.System?

23  **A.**   Nineteen.

24  **Q.**   So you have worked for I.C.System your entire life?

25  **A.**   Well, no.

1   **Q.**   Your entire working life?

2   **A.**   A long time.

3   **Q.**   Have you ever been arrested?

4   **A.**   No.

5   **Q.**   Have you ever been accused of perjury?

6   **A.**   No.

7   **Q.**   How many times have you testified for I.C.System at trial?

8           **MR. GOLDEN:**  Objection, relevance, your HOnor.

9           **THE COURT:**  As to the first two questions, you

10   shouldn't be asking those questions unless you have some good

11   faith basis to ask those, which I assume you don't have any

12   knowledge that she has been arrested or accused of a crime?

13          **MR. YARBROUGH:**  Oh, no, your Honor.  I was attempting

14   to establish that she is the person at I.C.System that is very

15   knowledgable, highly knowledgable of the business's procedures.

16   I'm not attempting to impeach her by her trial testimony, just to

17   show the frequency of it.

18          **MR. GOLDEN:**  Your Honor, here is my problem with that.

19   I think what he is trying to do is create some sort of

20   implication that my client gets sued a lot and therefore done

21   something wrong.  We will stipulate that everything that he said

22   regarding her knowledge and her experience with the company.  He

23   doesn't have to prove anything to my satisfaction.

24          **THE COURT:**  The objection is overruled.  You can ask

25   the question or you can accept the stipulation.

Page 57

1    **BY MR. YARBROUGH:**

2    **Q.**   Can you tell us how many times you have testified at trial

3    for I.C.System?

4    **A.**   Yes.

5    **Q.**   How many?

6    **A.**   Five.

7    **Q.**   Five trials?

8    **A.**   Yes.

9    **Q.**   How many times for a deposition?

10   **A.**   More than thirty, less than thirty-five.

11   **Q.**   Are you familiar with I.C.System's policies regarding

12   collection of debts?

13   **A.**   Yes.

14   **Q.**   Would you be the person at the firm that is most familiar

15   with those policies?

16   **A.**   Pretty much so.

17   **Q.**   Has I.C.System been sued before for violation of TCPA?

18          **MR. GOLDEN:**  Objection, your Honor, relevance.

19          **THE COURT:**  That goes to willfulness.

20          **MR. YARBROUGH:**  It does, that's exactly right.

21          **MR. GOLDEN:**  Your Honor, unfounded allegations of

22   lawsuits it would be hearsay.

23          **THE COURT:**  Your objection is overruled.  You can

24   answer the question.

25          **THE WITNESS:**  Repeat the question.

Page 58

1    **BY MR. YARBROUGH:**

2    **Q.**   Has I.C.System been sued -- well, first you are familiar

3    with the Telephone Consumer Protection Act, right?

4    **A.**   Right.

5    **Q.**   It's referred to as the TCPA?

6    **A.**   Yes.

7    **Q.**   You are familiar with the provisions of that act?

8    **A.**   In general, yes.

9    **Q.**   Are you familiar with, do you believe that your firm has to

10   comply with the TCPA?

11            **MR. GOLDEN:**   Objection, it calls for a legal

12   conclusion.

13            **THE COURT:**   Sustained.

14   **BY MR. YARBROUGH:**

15   **Q.**   What is your understanding of what your firm has to do to

16   comply with the TCPA?

17            **THE COURT:**   What does the TCPA cover?

18            **MR. YARBROUGH:**   Let me go more directly, your Honor.

19            **THE COURT:**   Get to the point of what this is about.

20            **MR. YARBROUGH:**   I'm sorry.

21   **BY MR. YARBROUGH:**

22   **Q.**   Does the TCPA prevent your firm from calling Larry Sclafani

23   on his cell phone using an auto dialer?

24            **MR. GOLDEN:**   Objection, calls for a legal conclusion.

25            **THE COURT:**   Overruled.   Your understanding.

1          **THE WITNESS:**  Repeat the question.

2    **BY MR. YARBROUGH:**

3    **Q.**    Does the TCPA prohibit your firm from calling Larry Sclafani

4    on his cell phone using an auto dialer?

5    **A.**    No.

6    **Q.**    It doesn't.  Can you please explain why it doesn't?

7    **A.**    Well, in this case we were given, he gave the cell phone

8    number to the creditor, so there was consent.

9    **Q.**    So because of his consent, you were allowed to use an auto

10   dialer to call him?

11   **A.**    We could have, yes.

12   **Q.**    And you did use an auto dialer to call him?

13          **MR. GOLDEN:**  Objection, calls for a legal conclusion

14   regarding what is an auto dialer.

15          **THE COURT:**  Define to her what an auto dialer is.

16   **BY MR. YARBROUGH:**

17   **Q.**    Did I.C.System, you admit that I.C.System called Larry

18   Sclafani; is that right?

19   **A.**    Yes.

20   **Q.**    And you admit that you called him on a phone number that you

21   now know to be his cell phone?

22   **A.**    Correct.

23   **Q.**    In placing those calls did I.C.System use any sort of

24   automated dialing device?

25          **MR. GOLDEN:**  Objection, your Honor, it's the same

Page 60

1   objection an automated dialing device.  I don't know what that

2   means.

3           THE COURT:  Objection is overruled.

4           THE WITNESS:  I know that we have -- first of all I'm

5   not a techie, so we do have technology that aids in calling

6   debtors, computer technology.

7   BY MR. YARBROUGH:

8   Q.   I would like to show you what has been marked as Exhibit A,

9   excuse me, not Exhibit A, Exhibit No. 1, I'm sorry, parties joint

10  Exhibit No. 1.  Could you turn to the page -- unfortunately these

11  pages aren't numbered, but it's on about three pages in and the

12  dates on that page are December 21, '07 -- excuse me December

13  20th, and also December 21st, and that is in the second column,

14  which is the date column.

15  A.   Okay.

16  Q.   Do you see the list --

17          THE COURT:  Wait, wait, wait -- what is the date at the

18  top and the time?

19          MR. YARBROUGH:  The first call at the top is 12/20/07.

20          THE COURT:  At what time?

21          MR. YARBROUGH:  At 11:24 p.m.

22          THE COURT:  Okay.  Is that the page the witness has?

23          THE WITNESS:  Yes.

24  BY MR. YARBROUGH:

25  Q.   About half way down that page, there are a series of --

Page 61

1        **THE COURT:**  Wait, I want to stop this right here.  I

2    want you to number the pages starting with the first page of the

3    computer printout as page one.  Do you understand, not the

4    request to produce.  Then number every page sequential to that

5    writing the number somewhere at the bottom of the page.

6        **THE WITNESS:**  So page one is starting with the

7    12/20/07?

8        **THE COURT:**  Page one says collect screen on top.

9        **THE WITNESS:**  Oh, okay.  Cheryl, can you put page

10   numbers on the Court's copy.

11       **THE CLERK:**  Yes.  What page starting?

12       **THE COURT:**  On the upper left hand corner, it says

13   collect screen.  It's the first computer printout page that

14   follows the request for production.  In the left hand corner it

15   says collect screen --

16       **THE CLERK:**  That would be page one?

17       **THE COURT:**  Yes.

18       **MR. YARBROUGH:**  I count fifty-one pages.

19       **THE COURT:**  That's what I have.  Refer to them because

20   it's a response to your request to production we are going to

21   call it R-1, R-2, R-3, R-4, R-5 and R-6 the request for

22   production.  Following that will be the regular page numbers.

23   Okay, what page are you referring to?

24   **BY MR. YARBROUGH:**

25   **Q.**  Referring to page five and in the center of that page there

1   is a message that has a time, has a date of 12/21/07 and a time

2   of 12:21 as well and it's the last one that has such a time.

3   Ms. Johnson, do you see that message, that entry?

4   **A.**   Yes.

5   **Q.**   It says dialer work, no payment; is that right?

6   **A.**   That's correct.

7   **Q.**   What does that mean?

8   **A.**   Well, you have to look at the whole date there on 12/21/07.

9   To the left of the date you see CKL, that is a collector's

10  initials and that person is updating their experience with taking

11  a call with the debtor.  So you have to look at all those lines

12  together.

13  **Q.**   What does the phrase dialer work mean?

14  **A.**   That means they are working on manual calls.

15  **Q.**   How do you indicate in these notes that a dialer was used?

16  **A.**   It's not there  but --

17       **MR. GOLDEN:**  Your Honor, I'm going to object, I think

18  the witness is confused by what he means when he says dialer.

19       **MR. YARBROUGH:**  An automated.

20       **THE COURT:**  She just said dialer work means manual.  So

21  are you talking about a manual call?

22       **MR. YARBROUGH:**  No, sir.  I can redo the question.

23  **BY MR. YARBROUGH:**

24  **Q.**   Does I.C.System use automated dialing technology to call

25  consumers to collect debts?

Page 63

1    **A.**    What do you mean by automated dialing?

2    **Q.**    All right, you are familiar with a traditional telephone

3    where a person types in numbers with their finger to dial a

4    number; is that right, you are familiar with that?

5    **A.**    Right, sure.

6    **Q.**    You're also familiar, or are you also familiar with

7    automated or computerized dialing systems in which a person does

8    not manually dial the phone numbers by using their fingers?

9    **A.**    Just a little in general, again I'm not a techie.

10   **Q.**    But you are the witness that appears for your client in TCPA

11   cases; isn't that correct?

12   **A.**    I have not appeared for that.

13   **Q.**    Are you aware of a case in which you have been identified as

14   a witness by your firm as being the person with the most

15   knowledge of the TCPA?

16   **A.**    No, I don't think so.

17   **Q.**    Are you aware that a Court has entered an order requiring

18   you in another case to appear this Friday to be deposed in a

19   case?

20        **MR. GOLDEN:**  Your Honor, I don't know what this has to

21   do with the price of tea in China.

22        **MR. YARBROUGH:**  She is claiming she doesn't know

23   anything about the TCPA or has little knowledge, but her company

24   asserts her as the firm's witness with the most knowledge.

25        **MR. GOLDEN:**  I don't know what he is talking about,

Page 64

1    your Honor.

2          **MR. YARBROUGH:**  Mr. Golden knows, he is counsel in the

3    other case I'm referring to, Mr. Golden is the counsel, is the

4    firm's counsel.  Been ordered  to appear in Sympio (phonetic)

5    versus I.C.System this Friday to testify as the witness with the

6    most knowledge of the TCPA.

7          **MR. GOLDEN:**  Are we going to have an argument about

8    that case here, your Honor, because what he is saying is

9    inaccurate.  Is there a corporate representative deposition,

10   yeah.  There is a 30B6 deposition this week for I.C.System in

11   that case.  There here.

12         Now his position, and this is where I think it crosses

13   the line, to say that we have been ordered to do this.  We had to

14   file a motion for protective order in that case, because he

15   unilaterally set that deposition.  So we haven't been ordered.

16   He makes it sound like we are trying to do something wrong and we

17   are not.  There is a deposition of I.C.System's corporate

18   representative in a similar case this Friday.  That's the extent

19   of it.  No one has said that this is the person.  We haven't

20   designated that.

21         **THE COURT:**  That's what asking the witness if she has

22   been designated in that case.  Have you been?

23         **THE WITNESS:**  No, I have not.

24   BY MR. YARBROUGH:

25   **Q.**  Are you aware that you will be testifying this Friday in

1    another case by video conferencing from Minneapolis?

2    **A.**   My understanding it wasn't established yet who was going to

3    be that.

4    **Q.**   You're not aware of the representations your attorneys made

5    before a Magistrate in Miami that you were not available on any

6    other day other than this coming Friday to testify?

7              **MR. GOLDEN:**  Your Honor, again, if we want to open this

8    whole can of worms.  It is obvious what he is now implying is

9    that I made some sort of misrepresentation.  Again, if we break

10   out the rule book and read 30B6, we can designate as many

11   different areas of inquiry as we want.  We are not required to

12   say that this specific person, that we are going to pick one

13   person.  This is frankly from my office the first time we have

14   ever had a deposition that involves both fair debt claims and a

15   TCPA claim.  As Ms. Johnson testified, she has never testified in

16   a TCPA claim case and we haven't made a determination who that

17   TCPA witness is going to be.  But from what her testimony is

18   today, it is likely not going to be her.

19             **THE COURT:**  Enough speaking objections.  The objection

20   is overruled.  He is asking her a question.  Does she plan on

21   testifying regarding TCPA Friday, yes or no?  She said, no,

22   right?

23             **THE WITNESS:**  Right, no.

24   BY MR. YARBROUGH:

25   **Q.**   You're not planning to testify?

1   **A.**   No.

2   **Q.**   Okay.  Are you aware that your attorney's have represented

3   to a Judge in Miami that you could not sit for your deposition on

4   October 16th, because October 30th was the first day that you

5   were available, and that you would be the witness testifying for

6   them?

7   **A.**   I don't remember that, no.

8   **Q.**   No, you weren't there.  I said are you aware that your

9   attorney's made that representation to a Judge?

10  **A.**   I don't know.

11  **Q.**   Okay, so you are not aware of that?

12  **A.**   Right.

13  **Q.**   Going back to the TCPA, the dialing device, are you aware of

14  statement on your firm's website that you use that your firm uses

15  auto dialing technology to call consumers?

16  **A.**   I don't know if it does or not, I'd have to see it.

17  **Q.**   Are you aware -- let me put it this way.  How many

18  collectors does your firm have?

19  **A.**   Approximately eight hundred.

20  **Q.**   Eight hundred collectors?

21  **A.**   Yes.

22  **Q.**   Do those eight hundred collectors when they are calling

23  consumers, do they always call the consumers by dialing the

24  number with their fingers?

25  **A.**   No.

1  **Q.**   When they don't dial the numbers with their fingers, what do

2  they do?

3  **A.**   They wait for it to come up on their system, wait for it to

4  connect into their phone.

5  **Q.**   So you have a device that telephones the consumers -- tell

6  me if I'm right -- you have a device that telephones consumers

7  and when it gets a consumer on the line, it funnels that call

8  into a collector for in person communication?

9  **A.**   Again, as I said before I'm not the technical person.  I

10  know we use computerized tools to aid in collecting debts.  We

11  also have what we call transfer agents that talk to people and

12  make sure the correct party and then calls are also transferred

13  to collectors when the right party is determined, but I don't

14  know the specifics of our equipment.

15  **Q.**   Are you, you were aware and your firm was aware that you

16  settled the FDCPA and the Florida Act components of this case and

17  that you paid Mr. Sclafani for the damages on those claims; is

18  that correct?

19  **A.**   That's correct.

20  **Q.**   You are aware of that.  And you were aware that today the

21  only issue in this case was the TCPA?

22  **A.**   Correct.

23  **Q.**   Why weren't you here at ten o'clock to represent your

24  company?

25        **MR. GOLDEN:**  Objection, relevance, your Honor.  Again,

1    there is no requirement under the law that the defendant be

2    physically present at trial.  This has nothing to do with whether

3    or not my client violated the TCPA in its calls Mr. Sclafani.

4            **THE COURT:**  The objection is overruled.  Why weren't

5    you here at ten o'clock?

6            **THE WITNESS:**  Well, I was working, and at the advice of

7    Mr. Golden.

8    **BY MR. YARBROUGH:**

9    **Q.**   You were advised by Mr. Golden to not be here?

10   **A.**   That, no, he said I should be available, but he was going to

11   address the Court with his positions on whether me being here or

12   not was required.

13   **Q.**   Physically where were you at ten o'clock this morning?

14           **THE COURT:**  That doesn't make any difference.  Move on.

15   **BY MR. YARBROUGH:**

16   **Q.**   Isn't it true that your firm uses prerecorded messages in

17   telephoning consumers?

18           **MR. GOLDEN:**  Objection, your Honor, relevance with

19   regard to this specific plaintiff.

20           **MR. YARBROUGH:**  He has alleged that he received

21   prerecorded messages from the defendant and prerecorded messages

22   violate the TCPA.

23           **MR. GOLDEN:**  I don't have a problem with him asking

24   with regard to this specific plaintiff.  But whether we use it

25   with these debtors as opposed to Mr. Sclafani is irrelevant.

1          **THE COURT:**  Okay, overruled.

2   **BY MR. YARBROUGH:**

3   **Q.**   Does your firm use prerecorded messages when calling

4   consumers?

5   **A.**   In general, yes, we do.

6   **Q.**   Are you aware that your attorney just represented to this

7   Court, that your firm did not use prerecorded messages?

8   **A.**   No, I'm not.

9          **THE COURT:**  Let's get to the point here.  What is the

10  difference if she knows what her attorney said.  The question is

11  what are the facts.

12  **BY MR. YARBROUGH:**

13  **Q.**   Does your firm have a means of notating messages in the

14  account history notes as to whether or not the messages left for

15  the consumer were a prerecorded message or there was a live

16  communication?

17  **A.**   Yes.

18  **Q.**   What is the notation that is used for prerecorded messages?

19  **A.**   There would be an indication that we used the vendor Live

20  Vox, I believe VOX, Live Vox.

21  **Q.**   How would that be noted?

22  **A.**   It would indicate Live Vox in the history notes.

23         **THE COURT:**  It would indicate what, that it was a

24  prerecorded message?

25         **THE WITNESS:**  It would say Live Vox and then Live Vox

1    is a vendor that we use, if we were to use that technology and

2    then it would indicate what Live Vox's result was, whether there

3    was a message left or there was dead air or something like that.

4    **BY MR. YARBROUGH:**

5    **Q.**    Is Live Vox an outside service that you use?

6    **A.**    Yes.

7    **Q.**    Are there other outside services than Live Vox that your

8    firm uses?

9    **A.**    Yes.

10   **Q.**    What are they called?

11   **A.**    TCN.

12   **Q.**    When your firm makes a Live Vox call, a call through Live

13   Vox, are those noted in your records L-I-V-E, V-O-X, is that how

14   it is noted?

15   **A.**    No.

16   **Q.**    How is it noted?

17   **A.**    On TCN it wouldn't be noted.  We receive reports from TCN.

18   **Q.**    What about Live Vox, how is it noted?

19   **A.**    Live Vox is noted in the notes.

20   **Q.**    How is it distinguished, what is the phrase?

21   **A.**    For what?

22   **Q.**    For Live Vox calls?

23   **A.**    It says Live Vox in the notes.

24   **Q.**    Where?

25   **A.**    If we made one, it would be in the notes.

1  **Q.**   Would it be designated by a character or a letter or a

2  number?

3  **A.**   It would say Live Vox.

4  **Q.**   So it would have the words L-I-V-E, V-O-X?

5  **A.**   Yes.

6  **Q.**   What is the other service you use?

7  **A.**   TCN.

8  **Q.**   When you use the TCN service, do your notes have a notation

9  regarding TCN/

10  **A.**   No.

11  **Q.**   From looking at these notes, can you tell if your firm used

12  TCN to leave prerecorded messages for Mr. Sclafani?

13  **A.**   Not by looking at the notes.  However, on this client we do

14  not use Live Vox or TCN period.

15  **Q.**   Do you have an agreement, a written agreement with this

16  client?

17  **A.**   We have a written agreement with this client.

18         **THE COURT:**  This client, what, are we talking about

19  Washington Mutual?

20         **THE WITNESS:**  Yes.

21  **BY MR. YARBROUGH:**

22  **Q.**   Are you familiar with the terms of that written agreement?

23  **A.**   I don't have it memorized, I know there is one in existence.

24  **Q.**   But you do know that agreement provides for what with regard

25  to prerecorded calls?

1  **A.**    In the master agreement there wouldn't be anything specific

2  about our collection attempts.  They would be in what is referred

3  to as statement of work, which can be changed etcetera.  But

4  based on my experience with this client, they did now allow to

5  use any prerecorded messaging on their accounts.

6  **Q.**    Do you have a specific written agreement with Washington

7  Mutual that prohibits you from using prerecorded messages?

8  **A.**    I don't know, but there is a written.

9  **Q.**    Why is it that you say that you know that Washington Mutual

10  doesn't allow prerecorded messages?

11  **A.**    Based on my experience on other issues, as well as dealing

12  with the vice-president of financial services, who was

13  responsible for that client, as well as account managers, my

14  understanding from all of them and the notes in the history on

15  this specific account, they don't allow those types of messages.

16  **Q.**    What notations would the TCN -- excuse me, I believe you

17  said that TCN, the TCN service uses prerecorded messages, right?

18  **A.**    Right.

19  **Q.**    You used TCN to broadcast prerecorded messages to consumers,

20  right?

21  **A.**    On other client's accounts, we have.

22  **Q.**    So you do use prerecorded messages, but you are saying you

23  didn't use them with Mr. Sclafani's account?

24  **A.**    That's correct.

25  **Q.**    Now what in these notes shows you that you did use or you

Page 73

1   did not use TCN?

2   **A.**   The lack of indication of Live Vox in there in the notes.

3   The fact that WaMu or Washington Mutual didn't allow auto

4   messaging.  And in the notes it shows that individual collectors

5   left messages.

6   **Q.**   But didn't you just testify that the notes, if you used TCN,

7   these notes won't show it?

8   **A.**   That's correct.

9   **Q.**   One way or the other?

10  **A.**   Also, in our investigation through discovery, we contacted

11  Live Vox to verify that there weren't any type of those messages

12  on any of those phone numbers in our records, as well as TCN.

13  **Q.**   Did you do that yourself?

14  **A.**   I directed the person that reports to me and I'm familiar

15  with the responses.

16  **Q.**   And the responses you received were written responses; isn't

17  that right?

18  **A.**   That's correct.

19  **Q.**   Why didn't you produce them in this case?

20  **A.**   I don't know.

21  **Q.**   Why didn't you designate Live Vox or TNC as witnesses in

22  this case?

23  **A.**   It's TCN and I don't know.

24  **Q.**   Don't you think that Live Vox and TCN would have information

25  relevant to this case?

Page 74

1   **A.**   I don't know, I guess so, they responded to us.

2   **Q.**   You said that you initiated a communication?

3        **THE COURT:**   They responded and said they didn't have

4   any information.   So they don't have information relevant to it.

5        **MR. YARBROUGH:**   But it wasn't disclosed to us.

6   **BY MR. YARBROUGH:**

7   **Q.**   As far as the numbers that your firm used to call for

8   Mr. Sclafani, where did you get the phone numbers that you used

9   to call Mr. Sclafani?

10  **A.**   From our client Washington Mutual.

11  **Q.**   Do you have any knowledge of where Washington Mutual

12  obtained those numbers?

13  **A.**   I know that, yes, I do have knowledge.

14  **Q.**   What is that knowledge?

15  **A.**   That knowledge is that they would have gotten these numbers

16  from the initial application.   If they hadn't, they would have

17  asked us to do the skip tracing on their behalf.

18  **Q.**   How do you know that?

19  **A.**   Because I know from dealing with that client.

20  **Q.**   How do you know that Washington Mutual didn't do its own

21  skip trace?

22  **A.**   They outsource their skip tracing to other agencies.

23  **Q.**   But how do you know they did or they didn't do it in this

24  case?

25  **A.**   Because we would have been the one they would have

1   outsourced it to.

2   **Q.**   One of these numbers that you called, you called three

3   numbers for Mr. Sclafani.  One of the numbers he says isn't his

4   number.  If it's not his number, how can you say that number

5   appeared in the application?

6               **MR. GOLDEN:**  Objection, speculation.

7               **MR. YARBROUGH:**  It is speculative.

8   **BY MR. YARBROUGH:**

9   **Q.**   Wouldn't you be speculating?

10              **THE COURT:**  What is the question?

11              **MR. YARBROUGH:**  Okay, my question is they called

12   Sclafani on this certain number.  He says isn't his number.  She

13   just testified, oh, we got the numbers from Washington Mutual and

14   Washington Mutual took it from the application.  So my question

15   is, if Washington Mutual got it from the application, why is it

16   that it is not his number?  How does she know that?

17              **THE COURT:**  Do you know the answer to that?

18              **THE WITNESS:**  I don't know.

19   **BY MR. YARBROUGH:**

20   **Q.**   So you would be speculating about where Washington Mutual

21   got these numbers for Mr. Sclafani?

22   **A.**   I feel pretty confident about the client.  They have been a

23   client of our for about, well they have changed now to Chase, but

24   we have had a relationship with them for seven, eight years.

25   **Q.**   But you can't say, you have no knowledge of what Washington,

1    you can't testify for Washington Mutual and say, how they got

2    this number, you don't know that, do you?

3    **A.**   I only know what I know.

4         **THE COURT:**  You're asking her these questions and when

5    she answers, you are saying she shouldn't answer -- I don't

6    understand why you ask her, where did Washington Mutual get these

7    numbers, she tells you and then you say how can you say that.

8         **MR. YARBROUGH:**  Well, my point is this.  She is saying

9    Washington Mutual got these numbers from Mr. Sclafani's original

10   application. Well, they have got a number that they are calling,

11   which isn't his number.  So the point there is Washington

12   Mutual --

13        **THE COURT:**  -- that's argument, that's not a question

14   for her.  First of all I don't know why you even ask her that

15   question.

16        **MR. YARBROUGH:**  To show there was other skip tracing

17   done that obtained improper numbers for Mr. Sclafani including

18   his cell number.

19   **BY MR. YARBROUGH:**

20   **Q.**   Okay, do you have any personal knowledge of whether

21   Washington Mutual sent this debt to any other collectors before

22   it sent it to your firm?

23   **A.**   No.

24   **Q.**   So they could have sent it to another debt collector?

25   **A.**   Yes, they could.

1   **Q.**   Do you have any personal knowledge that Lawrence Sclafani

2   ever signed an application or provided an application that had

3   his cell number on it to Washington Mutual?

4   **A.**   I don't have personal knowledge, but I have all those other

5   facts.

6   **Q.**   You suspect it?

7   **A.**   I highly suspect it.

8   **Q.**   But you don't have any proof of it?

9   **A.**   Okay.

10  **Q.**   You agree with that, you don't have any proof of it?

11  **A.**   Well, I would hope I have a little bit of whatever. I mean

12  based on my experience with that client and my understanding of

13  how it all works, I feel pretty good about the fact and our notes

14  that we didn't do any skip tracing.

15  **Q.**   I wasn't asking you about your skip tracing.

16  **A.**   I understand that, but you are asking me -- go ahead.

17  **Q.**   Have you ever worked for Washington Mutual?

18  **A.**   No.

19  **Q.**   Have you ever been to Washington Mutual's calling center or

20  credit card centers?

21  **A.**   Yes.

22  **Q.**   How long were you there for?

23  **A.**   I have made a few trips out to California, and when did that

24  I met with various employees of Washington Mutual for a couple of

25  days at the time.

1  **Q.**   So for two days you have met with people at Washington

2  Mutual?

3  **A.**   In each trip.

4  **Q.**   Have you ever seen an application -- have you ever seen

5  Lawrence Sclafani's application for the Washington Mutual card?

6  **A.**   No, I have not.

7  **Q.**   Didn't you request it from Washington Mutual to prove your

8  case?

9  **A.**   I know we requested whatever information they would have.

10 **Q.**   You did request it from Washington Mutual?

11 **A.**   We asked for debt information.

12 **Q.**   You asked for that from Washington Mutual?

13 **A.**   Right.

14 **Q.**   To try to prove your case?

15 **A.**   To help us, sure.

16 **Q.**   What did Washington Mutual give you?

17 **A.**   They sold the account, so they didn't have the information

18 anymore is what they told us.

19 **Q.**   So you don't have any documentary proof that Mr. Sclafani

20 provided his cell number to Washington Mutual at any time; is

21 that right?

22 **A.**   Other than our records of how the number came in.

23 **Q.**   Could you finish please.  You don't have any proof; is that

24 right?

25          **MR. GOLDEN:**  Objection, asked and answered, your Honor.

1     **THE COURT:**  Sustained, she said the only proof is the

2     way it came into her, it's circumstantial proof she is saying.

3     **BY MR. YARBROUGH:**

4     **Q.**   Are you familiar with the notes for Larry Sclafani's

5     account?

6     **A.**   Yes.

7     **Q.**   Are you familiar, take a look at page six, for example and

8     you see the calls there, that start on 12/22 up at the top of the

9     page and then the next column has the time.

10    **A.**   Yes.

11    **Q.**   You see the next column there next to the time, do you see

12    all those calls with a "D" in it?

13    **A.**   Yes.

14    **Q.**   What does that mean?

15    **A.**   I believe it indicates that we are dialing a number.

16    **Q.**   Dialing that number using an auto dialer, right?

17    **A.**   It's our technology.

18    **Q.**   Yes, it's our technology, but it's called an auto dialer;

19    isn't that right?

20    **A.**   I'm not sure if they call it auto dialer, a dialer.

21    **Q.**   What do you call it?

22    **A.**   I call it the computerized dialing technology.

23    **Q.**   That's when you are testifying in court, but what do you

24    call it at your office?

25    **A.**   They call it a dialer.

1  **Q.**   So those calls there were all placed, those calls with the

2  "D" were all placed with a dialer?

3  **A.**   Yes.

4  **Q.**   So this is a dialer that your firm has in-house, as opposed

5  to the Live Vox and the TCN dialer which are subcontractors for

6  you?

7  **A.**   Correct.

8  **Q.**   How many dialers do you have in-house?

9  **A.**   I don't know.

10  **Q.**   You have more than one, right?

11  **A.**   I'm not sure.

12  **Q.**   How many calls a month or per day or per week does

13  I.C.System make to consumers in America?

14  **A.**   Attempts would be hundreds of thousands.

15  **Q.**   Hundreds of thousands per what period?

16  **A.**   Months.

17  **Q.**   What would you say the number of calls a day?

18  **A.**   Well, I don't know the number, I just know we make a lot of

19  calls, yes.

20  **Q.**   You make several hundred thousands calls per day?

21  **A.**   It could be.

22  **Q.**   And one of the reasons you can make so many calls, with only

23  I think you said you had two hundred collectors?

24  **A.**   Eight hundred, about eight hundred.

25  **Q.**   One of the reasons you can make so many calls is you use

Page 81

1    automated dialing technology; isn't that right?

2    A.    We use, yeah, computerized technology.

3    Q.    And you used it to call Mr. Sclafani; isn't that right?

4    A.    That's correct.

5    Q.    How many times did you use your auto dialer to call

6    Mr. Sclafani's cell phone?

7    A.    I don't know.

8    Q.    Could you count them, you can tell from the notes, right?

9    A.    Sure.

10   Q.    Could you just go through them and count them and tell us

11   the number.

12        MR. YARBROUGH:  Or, your Honor, I don't know what time

13   it is, but is it time for lunch?

14        THE COURT:  It's time you should have done a discovery

15   deposition.  You're wasting an awful lot of the Court's time

16   bringing her in here and now she is going to go through fifty

17   pages of this to determine exactly how you are going to prove

18   your case?

19        MR. YARBROUGH:  I need to know the number of calls.  I

20   apologize, your Honor.  You're right.

21        THE COURT:  This is not a way to try a case, put a

22   witness on the stand and hope she is going to say what you want

23   her to say and then have her work through this while the Court

24   hangs around and listens.

25        MR. YARBROUGH:  I'm sorry.

1    **THE COURT:**  Why didn't you do discovery in this case?

2    **MR. YARBROUGH:**  Screwed up.  I did do discovery, I

3    didn't get her deposition and I got an order in another case that

4    she must appear this Friday.  They are not exactly volunteering

5    to go to depositions.

6    **THE COURT:**  What does that mean.  This case has been

7    set for trial for a couple of months now.

8    **MR. YARBROUGH:**  The discover was cut off though.

9    **THE COURT:**  All right, we are going to take a lunch

10   break until one o'clock.  It's 12:10 now.

11   **BY MR. YARBROUGH:**

12   **Q.**  Ms. Johnson, can I ask you over the lunch period, could you

13   count the number of calls and put a notation so we can discuss it

14   when we come back.

15   **A.**  Okay.

16   **THE COURT:**  Do that over the lunch break.  Court is in

17   recess until one o'clock.

18                    (A lunch recess.)

19   **THE COURT:**  Continuing in the case of Lawrence Sclafani

20   versus I.C.System, Case Number 09-60174-Civil.  Ma'am, you are

21   still under oath.  You may proceed with the direct examination.

22   **BY MR. YARBROUGH:**

23   **Q.**  Ms. Johnson, were you able to determine the total number of

24   calls that were placed by your firm to Mr. Sclafani's cell phone

25   using your dialer?

1  **A.**   Yes.

2  **Q.**   What was the number?

3  **A.**   Seventy-five.

4  **Q.**   The dialing device that you use, the computerized dialing,

5  let's refer to it as the dialer.  Is that all right?

6  **A.**   Okay.

7  **Q.**   I mean that's what you call it at the office, right?

8  **A.**   Some refer to it as that.

9  **Q.**   So we will call it the dialer.  The dialer does not involve

10 a human pressing telephone numbers, pressing into a key pad,

11 Mr. Sclafani's phone number; is that correct?

12 **A.**   Correct.

13 **Q.**   So the act of dialing that the dialer makes is an automated

14 or computerized non-human function?

15 **A.**   Partially.

16 **Q.**   What part it is automated and what part is not?

17 **A.**   The machine is automated, but it takes people to run it.

18 **Q.**   Yes, so humans have to program or otherwise engage the

19 dialer?

20 **A.**   Yeah, it has to give it directions.

21 **Q.**   They have to give it directions.  But once they give it its

22 direction, the dialer places the call without further human

23 intervention; isn't that correct?

24 **A.**   I believe so.

25 **Q.**   Was your firm collecting this debt on a commission or a flat

Page 84

1    fee basis?

2    **A.**   I believe it was commission.

3    **Q.**   When you determined that there were seventy-five calls

4    placed with the dialer, is that because you looked at the calls

5    that have a "D" in the fourth column, does that designate those

6    calls as being placed with the dialer?

7    **A.**   Yes.

8    **Q.**   And you counted seventy-five?

9    **A.**   Yes.

10   **Q.**   Does the notation enDI what does that mean in the same

11   column?

12   **A.**   Can I look at that?

13   **Q.**   Yes, take a look at a page nine for example, in the  middle

14   of the page, there is a number of entries there on 12/28 and they

15   say enDI?

16   **A.**   Those are housekeeping of the system itself.  It has nothing

17   to do with the collection activity on the account.

18   **Q.**   What does the phrase DWHU mean?

19   **A.**   Where is that?

20   **Q.**   It's on page eleven on the January 2nd, 2008 call at

21   4:47 p.m.the last entry for 4:47?

22   **A.**   Dialed worked hung up.

23   **Q.**   Now you saw in these notes that there were three separate

24   numbers that I.C. was calling for Mr. Sclafani; is that correct?

25   **A.**   Yes.

1   **Q.**   Now Mr. Sclafani testified that the 954-587-1986 number was

2   not his current home phone number.  Is that right?  I mean armed

3   with that information, can you say how that number got into these

4   notes?

5   **A.**   What was the number again please?

6   **Q.**   It's the one that ends in 1986, it's the 954-587-1986?

7   **A.**   You have to give me a minute here to make sure.  I need to

8   look at all the notes, before I can answer that question.  Yes, I

9   know how it got there.

10   **Q.**   How did it?

11   **A.**   That was a skip tracing to look for an additional phone

12   number.

13   **Q.**   What page number is that on?

14   **A.**   On page three.

15   **Q.**   Which line the 12/19 or 12/20?

16   **A.**   12/20/07 at 1:28.

17          **THE COURT:**  Page what?

18          **MR. YARBROUGH:**  Page three.

19   **BY MR. YARBROUGH:**

20   **Q.**   So what does that mean?

21   **A.**   That means that number was not sent to us by WaMu.

22   **Q.**   Doesn't that directly contradict your prior testimony that

23   you didn't do skip tracing on this account?

24   **A.**   For the account for the number at issue.

25   **Q.**   Oh, I see, so before when you said, you didn't do skip

Page 86

1   tracing you meant you do it and get his cell number?

2   **A.**   Correct.

3   **Q.**   But you did do skip tracing?

4   **A.**   Yes.

5   **Q.**   When you asked Washington Mutual to give you records about

6   Mr. Sclafani's account, you said their response was that they no

7   longer had the account, that they had sold it?

8   **A.**   Yes.

9   **Q.**   Did you contact the present owner of the account?

10  **A.**   No, we did not.

11  **Q.**   Did you contact any other owner of the account?

12  **A.**   No.

13  **Q.**   Are you familiar with a procedure called a cell phone scrub?

14  **A.**   In general.

15  **Q.**   What is your understanding of a cell phone scrub?

16  **A.**   That there is vendors out there that will check phone

17  numbers to see if they are cell phones.

18  **Q.**   So you could send Mr. Sclafani's number for example to a

19  cell scrub company and they could tell you if that was a cell

20  phone or not?

21  **A.**   RIght.

22  **Q.**   It's a commercial service?

23  **A.**   Yes.

24  **Q.**   Do you know anything about the price of that service?

25  **A.**   No, I do not.

1  **Q.**   Did you use that service with Mr. Sclafani's account?

2  **A.**   We didn't feel we needed to.

3  **Q.**   But you did use ceratin scrubs for Mr. Sclafani's account,

4  right?

5  **A.**   Yes.

6  **Q.**   You did a scrub to make sure he wasn't dead, right?

7  **A.**   I don't think so.

8  **Q.**   You did a scrub to make sure he hadn't filed bankruptcy

9  right?

10  **A.**   Let me look.  No, we did not.

11  **Q.**   Is there any way that your computer system labels a number

12  whether or not it is a residential or a landline phone versus

13  whether it is a cell phone?

14  **A.**   No.

15  **Q.**   So your system cannot accommodate a descriptive label in the

16  number fields, the phone number fields, for cell versus landline?

17  **A.**   Well, we are talking about, we have more than one system.

18  **Q.**   The one that you used for Mr. Sclafani?

19  **A.**   At the time there wasn't, I don't believe.  Let me think,

20  let me think.  I believe there is an additional field for cell

21  phone.

22  **Q.**   But there is none on Mr. Sclafani's account?

23  **A.**   Right.

24  **Q.**   In the first page of the notes on page one, it says the

25  number of calls placed to Mr. Sclafani is 546?

1    **A.**    Right.

2    **Q.**    That's the total number of calls that your firm placed to

3    Mr. Sclafani at the three numbers you had for him, right?

4    **A.**    No.

5    **Q.**    What is that?

6    **A.**    I.C.System doesn't make use of that field.  It's from a fax

7    system.  We don't own this computer system.  They put that

8    together to count up not only outgoing phone calls, it could be

9    incoming, it could be things that never made it out of the

10   building, it could be collectors updating on the account, so it

11   doesn't have much integrity to it.  So we don't use it.

12   **Q.**    But you're certain that your firm called seventy-five times

13   Mr. Sclafani's cell phone using a dialer?

14   **A.**    Correct.

15   **Q.**    Does your written agreement with Washington Mutual require

16   Washington Mutual to only give you phone numbers that they have

17   obtained consent to call?

18   **A.**    I don't think so.

19          **MR. YARBROUGH:**  No further questions.

20          **THE COURT:**  Any cross examination.

21          **MR. GOLDEN:**  Thank you, your Honor.

22                         CROSS EXAMINATION

23   **BY MR. GOLDEN:**

24   **Q.**    Ms. Johnson, what exactly do you do for I.C.System?

25   **A.**    My title is Director of Legal Affairs.  I manage our

Page 89

1   corporate legal department.  I'm first point of contact.  I'm not

2   an attorney, but I oversee litigation filed against the company

3   related to collections. I oversee all the corporate and collector

4   licensing.  I review collection agency agreements.  I work with

5   attorneys throughout the United States. I manage our consumer

6   affairs department, our debtor correspondence department, our

7   records management department.  I oversee letter administration.

8   I make sure that I.C. is kept up to date on laws that affect the

9   business.  That's kind of it in a nutshell.

10  **Q.**   Is part of your job also dealing with creditor clients?

11  **A.**   Sure.

12  **Q.**   Now you talked about Washington Mutual, just so we are all

13  clear, what did Washington Mutual used to be before it was

14  Washington Mutual?

15  **A.**   It was Providian.

16  **Q.**   Was Providian a client of the firm?

17  **A.**   Yes.

18  **Q.**   You testified about taking trips to California to meet with

19  people at Washington Mutual.  Does I.C.System do that with all

20  its clients?

21  **A.**   No.

22  **Q.**   Where does Washington Mutual rank in term of I.C.'s clients?

23  **A.**   It is I.C.System's top client.

24  **Q.**   So they are the biggest client you have?

25  **A.**   Yes.

Page 90

1    **Q.**   In addition to you going out to California has WaMu sent

2    people to your office in Minnesota?

3    **A.**   Oh, yes.

4    **Q.**   How often does that happen?

5    **A.**   At least quarterly.

6    **Q.**   Four times a year?

7    **A.**   Yes.

8    **Q.**   What is the purpose of those visits, social?

9    **A.**   Sometimes, but, no, the quarterly they audit I.C.System.

10   **Q.**   When you say audit, what do you mean?

11   **A.**   A thorough audit of all their requirements, making sure

12   I.C.System is compliant with their collection activities.   They

13   listen and monitor collectors.   Well, they can do that any time

14   they want to.   It's a very extensive audit.   They are auditing

15   our security practices.   An example would be they would make sure

16   we are not doing automated messages.   It's pretty gruesome,

17   because if we don't pass all the audits, they won't give us

18   anymore work.

19   **Q.**   The notes that are Exhibit No. 1 is that something that is

20   provided to Washington Mutual as well?

21   **A.**   Yes.

22   **Q.**   Is Washington Mutual aware of the fact that I.C.System uses

23   prerecorded voices with some of its accounts?

24   **A.**   I'm sorry, I just lost my train of thought.

25   **Q.**   Has I.C.System made Washington Mutual aware of the fact that

1   I.C.System does in fact use prerecorded messages for some of its

2   collection efforts on accounts?

3   **A.**   Not on theirs.

4   **Q.**   Generally?

5   **A.**   Yes.

6   **Q.**   Do you know if in these audits that Washington Mutual

7   performs is one of the issues they address whether or not

8   I.C.System is complying with its requirement not to use

9   prerecorded voices on WaMu accounts?

10   **A.**   Oh, yes.

11   **Q.**   The four calls that were listed in the complaint, are you

12   familiar with those, have you reviewed the complaint?

13   **A.**   Yes.

14   **Q.**   Were you able to isolate those on the notes?

15   **A.**   Yes.

16   **Q.**   Let's look at each one of those individually quickly.  The

17   first one is January 3rd, 2008 which in my notes on page --

18        **MR. YARBROUGH:**  Pardon me, your Honor, we would be

19   willing to stipulate that those messages are not of prerecorded

20   messages, the four messages that are listed in the pretrial

21   stipulation that Mr. Golden is about to go over.

22        **THE COURT:**  Okay.  Do you want to stipulate to that.

23        **MR. GOLDEN:**  He testified under oath that they were.

24        **THE COURT:**  Well, he testified that he thought the

25   January 3rd one was, the others he said he would have to hear the

1  voice.  Anyway he is offering to stipulate that they are not

2  prerecorded.  You are welcome to do whatever you want.  You can

3  accept the stipulation or you can go through it.

4  **BY MR. GOLDEN:**

5  **Q.**  You testified earlier that the phone number at issue here,

6  which is the one that ends in 8383 was supplied by Washington

7  Mutual to I.C.System; is that correct?

8  **A.**  Yes.

9  **Q.**  You also had indicated that there was a skip trace performed

10  that yielded another number?

11  **A.**  Right.

12  **Q.**  If there had been a skip trace that revealed that 8383

13  number, how would that appear in the notes?

14  **A.**  Well, it would show that we did, it would be very similar to

15  the one with that other number.

16  **Q.**  So the one which is on page three, where it says RP phone

17  received and then it has the 1986 number?

18  **A.**  Yes.

19  **Q.**  Is there any way that if I.C.System were to perform a skip

20  trace and retrieve that 8383 number, that it could be somehow

21  later taken out of the system as a skip trace?

22  **A.**  Yes.

23  **Q.**  Maybe you are not understanding my question.  Is there any

24  indication in the notes as we sit here today that 8383 was a skip

25  trace?

1   **A.**   No, there isn't.

2   **Q.**   Would it be possible, for example this one that is 1986 skip

3   trace, would it be possible for  me today to go into the computer

4   system and remove the fact that was a skip trace?

5   **A.**   No.

6   **Q.**   Once it's in the computer, it's in forever?

7   **A.**   Right.

8   **Q.**   You also testified you have some experience in dealing with

9   Washington Mutual and where they come up with telephone numbers;

10   is that correct?

11   **A.**   Yes.

12   **Q.**   What is your experience on that issue in terms of the

13   numbers they provide you?

14        **MR. YARBROUGH:**  Excuse me, your Honor, I'm going to

15   object to hearsay, what Washington Mutual's procedures are.  She

16   doesn't work there, she doesn't know what they are.

17        **THE COURT:**  You questioned her about that.

18        **MR. YARBROUGH:**  Yes, I did.

19        **THE COURT:**  I think you opened up the door.

20        **MR. YARBROUGH:**  Okay.

21        **THE COURT:**  You can answer the question.

22        **THE WITNESS:**  Can you repeat the question.

23   **BY MR. GOLDEN:**

24   **Q.**   Are you familiar with how Washington Mutual gets the

25   telephone numbers that it provides I.C.System to collect debts?

Page 94

1    **A.**   Yes.

2    **Q.**   What do you know about that?

3    **A.**   They get it off the application.

4    **Q.**   How do you know that?

5    **A.**   Because if they didn't get it off the application, then they

6    would ask us to do a skip trace.

7    **Q.**   Would that have been part and parcel of what had happened on

8    this account?

9    **A.**   Yes.

10   **Q.**   So from your experience is it fair to say that if that

11   number hadn't come from the application completed by

12   Mr. Sclafani, you would have been asked to do a skip trace?

13   **A.**   Yes.

14   **Q.**   Now would I.C.System have done any additional work to

15   determine whether or not this 8383 number or any of the other

16   numbers provided by Washington Mutual was in fact a cell phone

17   number?

18   **A.**   We didn't need to.

19   **Q.**   Why not?

20   **A.**   Because of what we know about our client.  If that came in

21   with the number, they got it off their application.

22              **MR. GOLDEN:**  That's all the questions I have, thank

23   you.

24              **THE COURT:**  Any redirect?

25                            REDIRECT EXAMINATION

1    **BY MR. YARBROUGH:**

2    **Q.**   Do you have a written agreement with Washington Mutual that

3    requires Washington Mutual to only give you numbers that are off

4    of the credit application?

5            **MR. GOLDEN:**  Objection, asked and answered.

6            **MR. YARBROUGH:**  No, I didn't ask it that way, I asked

7    if they had an agreement.

8            **THE COURT:**  Objection is overruled.

9            **THE WITNESS:**  Not that I know of.

10   **BY MR. YARBROUGH:**

11   **Q.**   How do you know that Washington Mutual uses you as their

12   exclusive agent for skip tracing?  Do you have such an agreement?

13   **A.**   There is not a written agreement.

14   **Q.**   So isn't it possible that Washington Mutual could have been

15   dissatisfied with your service, or just wanted to try someone

16   else and use a skip trace other than your firm?

17   **A.**   It's very unlikely.

18   **Q.**   But you wouldn't know about it?

19   **A.**   We would know if they are not happy with us, through our

20   audits and whether or not we are continuing to get work.

21   **Q.**   It's like when a boyfriend and girlfriend are dating,

22   sometimes somebody doesn't know until the last minute.  Maybe

23   they were unhappy with you and they went to someone else, and you

24   wouldn't know it; isn't that possible?

25   **A.**   It's unlikely.

Page 96

1    Q.   It's unlikely, but It's possible?

2    A.   Sure anything is possible.

3    Q.   I think you said earlier that the computer records could not

4    be altered?

5    A.   Correct.

6    Q.   Do you believe that there is something special about your

7    computer that makes it such that it could never be altered?

8    A.   What we were referring to is once something is in the notes,

9    there is not a human user that can remove or erase them.

10   Q.   You mentioned that when you tried to get information from

11   Washington Mutual, that they told you they didn't even own the

12   debt; is that right?

13   A.   At the time after so many years, yes.

14   Q.   So many years, but I mean you were collecting this last

15   year?

16   A.   They sold it, when we asked them, they had sold it.

17   Q.   Why did they keep you in the dark?  I mean you're so tight

18   with your relationship with them, how come you were collecting a

19   debt that you didn't even know that they don't even own anymore?

20   A.   We weren't.

21   Q.   You weren't?

22   A.   We weren't attempting to collect a debt that they did not

23   own.  They owned the debt when we were attempting to collect the

24   debt.

25   Q.   Do you know when they sold it?

Page 97

1   **A.**   No, I do not.

2          **MR. YARBROUGH:**  All done.

3          **THE COURT:**  Thank you, ma'am, you may step down.  Does

4   the plaintiff have any further witnesses or evidence?

5          **MR. YARBROUGH:**  No, sir.

6          **THE COURT:**  Does the defense have any witnesses or

7   evidence?

8          **MR. GOLDEN:**  No, your Honor.

9          **THE COURT:**  Let me hear argument then.

10          **MR. GOLDEN:**  Your Honor, I'm sorry I made a mistake.  I

11   wanted to put Mr. Sclafani's deposition transcript in.  I didn't

12   want to read the whole thing, but we are entitled to put it in.

13          **THE COURT:**  Okay, any objection?

14          **MR. YARBROUGH:**  Yes.

15          **THE COURT:**  What's the objection?

16          **MR. YARBROUGH:**  I don't understand why he is putting in

17   the entire transcript.

18          **MR. GOLDEN:**  I'm entitled to.

19          **MR. YARBROUGH:**  He didn't list it as an exhibit.

20   Unless it's for impeachment, the whole thing wouldn't be for

21   impeachment.

22          **THE COURT:**  Okay, what do you say about that?

23          **MR. GOLDEN:**  Your Honor, I can have my client sit up

24   there and we can read through the whole thing and read it in.

25   That's what we would do if it were a jury trial.  Since this is a

1    bench trial, I'm entitled --

2         **THE COURT:**  -- what he is saying, you didn't tell him,

3    you didn't list it as an exhibit.

4         **MR. GOLDEN:**  It's not an exhibit, it's his testimony.

5    Again, I can put it in.

6         **MR. YARBROUGH:**  He's available.

7         **THE COURT:**  Hold on a second.  First of all because he

8    is available doesn't matter.  It's a statement by a party

9    opponent, so it's an exception, it's not hearsay, it can come in.

10        The issue then is, you are supposed to list your

11   exhibits so the other side knows what you are introducing so they

12   can be prepared for it.  You didn't list the exhibit of the

13   deposition.  Why did you not list the exhibit of the deposition?

14        **MR. GOLDEN:**  Because it's not an exhibit, your Honor.

15   Again, I can have my client sit on the stand and we can simply

16   read the deposition transcript into the read, like often happens

17   in jury trials.

18        **THE COURT:**  But then it would be an exhibit, it would

19   still be an exhibit.  If you played it, if you read it, it's an

20   exhibit.  You have to have the transcript for them to read to be

21   an exhibit, it's an exhibit.  It should have been listed on your

22   exhibit list.  Tell me why it was not.

23        **MR. GOLDEN:**  Because if I had done this in a jury

24   trial, the deposition transcript itself would not go to the jury.

25   It would be read into the record just as though there is a

1    specific jury instruction on deposition testimony.

2         **THE COURT:**  That's actually up to the individual Judge

3    if they want the jury to have the transcripts of the testimony or

4    not.  But it should have been listed as an exhibit.  Why was it

5    not listed as an exhibit?

6         **MR. GOLDEN:**  Because it is not.

7         **THE COURT:**  I'm telling you that it is an exhibit.  So

8    now tell me why you didn't list it, is it because you thought it

9    was not an exhibit, is that why?

10        **MR. GOLDEN:**  Because I didn't believe it was an

11   exhibit.  Number two, are they claiming some sort of prejudice

12   because I want to put his client's -- if we move to the issue

13   okay it's an exhibit, you didn't list it, they can't claim any

14   sort of prejudice.  It's his client's deposition testimony.  All

15   I want to do is put the deposition testimony into evidence as

16   part of my case.  I believe I am entitled to do that.

17        **THE COURT:**  Okay, what do you say about that?

18        **MR. YARBROUGH:**  Never disclosed.  He has the witness

19   here, he could have asked him anything he wanted.  The case is

20   closed, the exhibits are closed.  Both parties closed.

21        **THE COURT:**  Well, he closed two seconds ago. All right,

22   I'm going to allow the admission of the deposition.

23        **MR. GOLDEN:**  Thank you, your Honor.  Mr. Golden, I will

24   tell you though you need to, this is not hide the ball.  Do you

25   understand, Mr. Golden?  You came in here without the witness

1   that you indicated you were going to bring in hopes that the case

2   would be kicked because wouldn't have sufficient evidence.

3           Now you are introducing a deposition, after not listing

4   it as an exhibit, or telling the opposing side I'm going to

5   introduce the testimony that was obtained in the deposition.

6           I don't appreciate that kind of conduct.  I'm allowing

7   the deposition in, but I'm giving you a warning for next time.

8   Don't be playing things so close to the vest.

9           **MR. GOLDEN:**  Your Honor, I have done noting outside of

10  the rules of civil procedure, the rules of evidence, or the local

11  rules.  I'm protecting the interest of my client and as long as I

12  operate within those rules, which I have absolutely done, I'm

13  entitled to do that.

14          **THE COURT:**  Well, I find your candor to the Court and

15  candor opposing counsel is lacking, which I think our local rules

16  require.  I think by leading counsel to believe that you were

17  going to have this witness here, that was unfair in not having

18  her here.

19          Any other evidence for either side?

20          **MR. GOLDEN:**  No, sir.

21          **THE CLERK:**  Excuse me, Judge, what exhibit number is

22  going to be for the defendant?

23          **MR. GOLDEN:**  I guess it will be Defendant's Exhibit

24  No. 2.

25          **THE COURT:**  Okay, hand a copy up to the clerk.

1              (Defendant's Exhibit No. 2 received in evidence.)

2         **THE COURT:**  What do you say, Mr. Yarbrough.

3         **MR. YARBROUGH:**  They admitted that they left

4    seventy-five calls, that they placed seventy-five calls to

5    Mr. Sclafani's cell phone using an auto dialer.  The device that

6    they used falls within the definition of an auto dialer.

7         **THE COURT:**  Let me ask you something.  Are you dropping

8    your prerecorded calls?  Since there has been no testimony other

9    than your client, who he thought one was prerecorded and you

10   stipulated that it was not and the witness you called made clear

11   that they never made prerecorded calls.  I'm not aware of any

12   evidence of prerecorded calls, other than your witness, I guess

13   you client did say that he heard robotic voices on occasion.

14        **MR. YARBROUGH:**  I believe his testimony on that was

15   that he felt he had received in the neighborhood of forty or

16   fifty prerecorded messages was his testimony.

17             We admit that the four calls in the pretrial

18   stipulation, that are also in the complaint, that those are live

19   messages.  The defendant's claim is we never left a prerecorded

20   message and I believe that he has testified to it, and they said,

21   no, they don't.  So it's up for grabs.  I mean it's a factual

22   call, it's up for grabs.  But I think they have admitted

23   seventy-five calls.

24        **THE COURT:**  Just so we can put that at rest, my factual

25   finding is that there were no prerecorded calls, based on your

Page 102

1    client's testimony, or hesitant testimony regarding it and based

2    on positive testimony by the corporation that they are not

3    allowed by Washington Mutual.  There would be indications in the

4    records if it occurred.  And I believe you told me ahead of time

5    there would be indications in the record if it occurred and there

6    are no indications in the records that anyone can identify.

7          **MR. YARBROUGH:**  Well, just to clarify, because I'm

8    concerned about my representations to this Court.  I understood

9    the notation in there that said live -- that said, pre -- I can't

10   remember the phrase -- auto message.  They are saying, they

11   testified, that, no, that means they heard an auto message on the

12   consumer's end.  I mistook those as being to mean they were using

13   an auto dialed call.

14         **THE COURT:**  Okay.

15         **MR. YARBROUGH:**  Sorry.  Okay, on the dialer calls, they

16   admit there are seventy-five of them.  We believe we have proven

17   that their dialer meets the definition in the FCC January '08

18   order, because it doesn't involve human interaction.

19         **THE COURT:**  Where does it say that in the order?  Are

20   you looking at the attachment that was attached to your trial

21   memo?

22         **MR. YARBROUGH:**  Yes, sir.  On page eight of the FCC's

23   order, paragraph number thirteen, near the bottom of that, about

24   midway through, right after footnote forty-seven it says:  The

25   commission noted that the evolution of the teleservices industry

Page 103

1    has progressed to the point where dialing lists of numbers was

2    far more cost effective, but that the basic function of such

3    dialing equipment had not changed.  The capacity to dial numbers

4    without human intervention.

5         Judge Dimitrouleas in the case we had up there with

6    him, the same attorneys, he found the dialer did not involve

7    human interaction.  It doesn't require -- the key is they are

8    getting out of having to dial the number with fingers and they

9    have a machine that does it.  That machine means it is a dialer.

10

11        **THE COURT:**  Is it a dialer if I have my office call and

12   it has speed dial on it, have to push a key that dials seven

13   numbers or ten numbers now I guess, that would not be an

14   automatic dialer because it involved human intervention, I guess

15   had to push the number, even though I'm pushing one number

16   instead of ten numbers?

17        **MR. YARBROUGH:**  It's an extreme example.  The

18   difference would be that their procedure is they make hundreds of

19   thousands of calls using a machine that does that on a repetitive

20   basis, as opposed to -- I mean we are not contending that the use

21   of a speed dial is a dialer.  But as the FCC notes it here, the

22   technology is changing and they have adapted in January '08 this

23   order to point out that it is the lack of human intervention in

24   the dialing process.

25        So I think that the point about would a speed dial be

1    it, it might be.  A speed dial might be one.  I don't know.

2        But this is a max dialing device that is used to call

3    large numbers of consumers without human intervention, without

4    human dialing of the number.

5        **THE COURT:**  Okay.

6        **MR. YARBROUGH:**  As far as consent goes, Mr. Sclafani's

7    has testified in his deposition and he checked some things after

8    his deposition, because as he said, he didn't even understand

9    that was an issue in this case.  He just wanted to stop them from

10   calling.  When we took the deposition, there was four or five

11   different counts pending.  Two or three of those have been settle

12   dor dismissed.

13       But after he had his deposition, he said that he

14   remembered, I believe he testified at his deposition, that he

15   didn't given them the cell and his thinking was afterward, I

16   didn't give them the cell, because I didn't have it then.  He

17   went and checked with the cell company and he checked the phone

18   and he found that he didn't even have the cell number when he

19   took out the application.

20       The defendant, you know, initially they testified,

21   well, we don't do skip traces.  We don't do it.  Then she

22   clarified, well, wait a minute we did a skip trace and we did one

23   on this account, but we didn't do it with respect to the cell

24   number.

25       **THE COURT:**  I don't think she ever said they don't do

1   skip traces.   It was clear from the beginning they did skip

2   traces.   I can't remember if she said they didn't do it on the

3   cell phone, or they didn't do it  on this account, but she made

4   clear they would have asked her to do the skip trace and it would

5   show that a skip trace was done and that produced the cell

6   number.

7         **MR. YARBROUGH:**  Right.  Let me clarify that.  I can't

8   say that she said that she didn't do skip traces.  What I think

9   my recollection of her testimony was, that she didn't do a skip

10  trace on this one, on this account and then later said, well,

11  wait a minute, we did with respect to that number.  We didn't get

12  the cell number off the skip trace, but we did do a skip trace

13  that resulted in this mystery number that he thinks is from his

14  daughter's bedroom seven years ago whatever.

15        The burden of proof is on them to prove that he gave

16  them the number, and to prove that he gave them that number in

17  the course, during the course of the transaction that resulted in

18  the debt.  I'm reading from the very bottom of page six of the

19  FCC's order.

20        They also have the burden of proof on that.  My point

21  is they haven't met the burden of proof to show that this number

22  was provided to Washington Mutual in the course of granting, in

23  the course of the transaction that resulted in the debt.

24        They have some circumstantial evidence that hey

25  Washington Mutual gave it to us.  Apparently that is true.  But

Page 106

1     they don't know how Washington Mutual got it.  They say, yes, we

2     do skip traces for Washington Mutual.  They would have referred

3     it to us.  They don't have a written agreement that says that.

4     There is no guarantee that Washington Mutual could have been

5     dissatisfied with them and gone to someone else and there could

6     be other providers that they don't know about.

7          Another thing they didn't testify about, which is

8     specifically prohibited in this FCC order is they are not allowed

9     to obtain the number by caller ID.  What I mean is if

10    Mr. Sclafani called Washington Mutual to inquire about his

11    account and he is calling from his cell number, and they capture

12    that number with caller ID technology, that is not a consent.

13         It's specifically covered in the FCC's order, covered

14    at page six on paragraph ten.  I'm sorry it's at the footnote at

15    the bottom of that page, footnote thirty-four on page six.  They

16    go into capturing the number by caller ID is not considered

17    consent.  They may have captured it.

18         It's their burden of proof.  They don't have the

19    application here.  They don't have any documentary evidence that

20    Mr. Sclafani gave that number to them.  They don't do cell

21    scrubs.  They know what a cell scrub is.  They could prevent

22    this.  They could prevent calls to a cell phone.  They don't have

23    anything on their records that show this is a cell number.  There

24    is no field that marks the number as a cell.

25         They don't have an agreement with Washington Mutual

1     that Washington Mutual only provides cellular numbers that have

2     been consented to.  They haven't done anything.  Their reliance

3     is totally on this idea, hey, Washington Mutual, you know we are

4     good friends.  They are one of our big clients and they wouldn't

5     do that, but they don't have it in writing.  They don't have an

6     agreement and they don't have any proof of that.

7          They haven't met their burden of producing evidence

8     here today.  It is not our burden to prove that Mr. Sclafani did

9     or did not consent to the calls to his cell.  It's not our burden

10    to prove that he gave his number to Washington Mutual or not.  It

11    is their burden. They have to prove by a preponderance of the

12    evidence.  Basically all they have said, is, hey we got the

13    number from Washington Mutual, so we assume it came off of the

14    contract.

15         His testimony was, I didn't even have the cell phone

16    number when I got that contract.  He testified he got the credit

17    card in December '06 and he didn't get the cell phone number that

18    the calls were placed to until I believe it was June or July of

19    '07.  He didn't even have the number then.  It doesn't make sense

20    that if he is in default on a credit card, that he is going to

21    call up and say, hey, by the way here is my new number, why don't

22    you call me here.

23         He might have called them.  He might have called them

24    and they captured his number off called ID.  We don't know, we

25    have no idea how that number got in there.

1          **THE COURT:**  Okay.

2          **MR. YARBROUGH:**  Thank you, your Honor.

3          **THE COURT:**  Mr. Golden.

4          **MR. GOLDEN:**  Your Honor, our position is plaintiff has

5     not sustained his burden to prove that the phone system used here

6     was in fact subject to the TCPA.  What Mr. Yarbrough read you

7     from the FCC opinion specifically says that in order to qualify,

8     it has to be able to operate without human intervention.  We know

9     from Ms. Johnson's testimony that the phone system in this case

10    couldn't do that, that it actually needed humans to input the

11    information, the specific phone numbers to be called in order to

12    operate.  So there is human intervention.   There is a human

13    being putting the numbers into the system in order to make the

14    calls.

15          It is not simply drawing numbers.  The typical

16    situation, your Honor, would be a telemarketer, simply drawing

17    numbers, that has a computer system that draws numbers from the

18    white pages, from the yellow pages, and being able to call

19    randomly without any sort of human intervention.

20          In this case that is not the case.  The numbers that

21    are being called are specifically put into the system by a human

22    being.

23          The other issue, your Honor, on the prerecorded

24    messages, I don't know where we stand on that issue.  I think the

25    evidence is clear Mr. Sclafani doesn't know whether or not these

Page 109

1    were provided --

2         **THE COURT:** -- I already made a factual finding there

3    is not sufficient evidence of prerecorded messages.

4         **MR. GOLDEN:** Right, you did make that factual finding.

5    So I do know where we stand on that.

6         The other issue, your Honor, is this issue of prior

7    expressed consent.  Mr. Yarbrough got up here and said, gee, we

8    don't know whether WaMu did some sort of capture when he called

9    them.  Well, there is no evidence and Mr. Sclafani was on the

10   stand.  If he had called Washington Mutual, they could have put

11   on evidence to suggest that maybe it was some sort of capture.

12   But there is no evidence of that.  That is pulling something out

13   of the air and saying, well, maybe it was some sort of capture

14   that they did when he called.   But there is no evidence that he

15   ever called Washington Mutual.  In fact in the deposition you

16   will see that he testified that was never contacted by Washington

17   Mutual.

18        One of the other things that Mr. Yarbrough said is that

19   we don't have the documents to show that he put this on the

20   original application.  Well, he also talks about, well, gee, my

21   client's testimony is he got the cell phone after he opened this

22   account.  Well, it would have been very easy for them, since that

23   wasn't what he said at his deposition, it would have been very

24   easy for them to have gotten a copy of that cell phone contract

25   and provided it to us and introduced that as evidence in this

Page 110

1    case, so the Court wouldn't simply have to take Mr. Sclafani's

2    word for it.

3            What we do know from Mr. Sclafani is that his testimony

4    today was greatly different than it was at deposition.  At

5    deposition he testified that he didn't remember how he even

6    opened this account or when it was.  He testified he didn't know

7    if he did it through the mail, by going to the office, or by

8    doing it over the Internet.

9            He testified specifically at deposition in response to

10   my question, what phone numbers did you give them.  His response

11   was, I don't know.  Now his testimony is, well, I don't know what

12   it was, but I know it wasn't my cell phone number.

13           What do we also know from Mr. Sclafani.  Again, at his

14   deposition testimony, he specifically stated that he doesn't use

15   his home phone number.  He mainly uses his cell phone number.  He

16   testified that he uses his cell phone number for business.  That

17   he gives it out to people who want to contact him to use his

18   painting business.  It's what a lot of people do.  They use their

19   cell phone number as their primary contact number.  That's what

20   Mr. Sclafani did.  He used his cell phone number as his primary

21   contact number.

22           That's the number that he gave to Washington Mutual

23   when he opened the account.  How do we know that from the other

24   end, we know that based upon the testimony of Ms. Johnson.

25   Ms. Johnson's testimony is they are the biggest client of the

Page 111

1    firm.  They have been a client of ours for seven or eight years.

2    I go out there to meet with them on a yearly basis.  They come to

3    our office four times a year.

4            What do we know from that.  Well, we learned from that

5    experience, that relationship that there is certain things that

6    Washington Mutual does for us.  They provide us numbers.  And we

7    know from her experience, based upon her dealings with Washington

8    Mutual, that the numbers they provide are the numbers Washington

9    Mutual gets off that application.

10           We know in this case there is discussion about whether

11   or not a skip trace was done.  Did we do a skip trace to find

12   this other number, yeah, but there is no evidence we did any sort

13   of skip trace with Mr. Sclafani's number.  The only evidence in

14   the case, your Honor, the only credible evidence in the case is

15   that I.C.System got this number from Washington Mutual.

16   Washington Mutual, as was its practice, got it off the

17   application and provided it to I.C.System.

18           That, your Honor, is the very definition of prior

19   expressed consent under the TCPA.  On that basis, as well as the

20   fact the plaintiff has failed to meet its burden of proving this

21   is an automatic telephone dialing system, my client is entitled

22   to a judgment.  Thank you.

23           **THE COURT:**  You may briefly respond.

24           **MR. YARBROUGH:**  It's a guess that they got the number

25   off of the application.  They don't have the application.

Page 112

1   Mr. Golden said we should bring the application here.  It's not

2   our burden of proof and we are not the ones that are so friendly

3   with Washington Mutual.

4         Mr. Sclafani's testimony at his deposition was, I don't

5   know what number was on there, but it was also I didn't give them

6   my cell.  I know it's not my cell.

7         They need to prove express consent, not us.  They

8   needed to ask the questions of whether or not Mr. Sclafani ever

9   called Washington Mutual.  The issue, he said in his deposition

10  that they never called him, but that's not the issue.  The issue

11  is if he called them, they can get his number from called ID.

12        **THE COURT:**  Okay, I've heard that already.  Anything

13  else new?

14        **MR. YARBROUGH:**  The loading of numbers Ms. Johnson

15  testified, well, we have to load the dialer with numbers before

16  it places the calls.  That issue was dealt with in Hicks versus

17  Client Services, Judge Dimitrouleas found, yes, you do have to

18  load numbers into the dialer.  It doesn't work by magic.  But

19  once you load them, it's without human intervention to place

20  those calls, and therefore it is a dialer within the statute.

21  Thank you, your Honor.

22        **THE COURT:**  Already, do you want me to dictate now my

23  findings of fact and conclusions of law, or do you guys want to

24  provide me with proposed findings of fact and conclusions of law?

25        **MR. YARBROUGH:**  No, I think the Court should, we should

1    know now.

2         **THE COURT:**  What do you think, Mr. Golden?

3         **MR. GOLDEN:**  It's your court, your Honor.

4         **THE COURT:**  If I do it now, I'm not going to write an

5    order.  You can have this transcribed.

6         **MR. YARBROUGH:**  Yes, that's fine.

7         **THE COURT:**  And use it if you want to on an appeal.  Is

8    that okay with both sides?

9         **MR. GOLDEN:**  Yes.

10        **MR. YARBROUGH:**  Okay.

11        **THE COURT:**  As to whether or not the plaintiff gave

12   prior expressed consent to allowing the debt collector to call

13   his cell phone, I find that the defendant has not met their

14   burden of providing proof by a preponderance of the evidence,

15   that he expressly consented to them calling his cell phone.

16        They presented evidence through Ms. Johnson, who I

17   found to be a credible witness that in her experience Washington

18   Mutual generally provided her with numbers off of credit

19   applications.  But she had no knowledge as to how this particular

20   telephone number was obtained by Washington Mutual.  And I note

21   that in the FCC declaratory ruling, which was released on January

22   4th, 2008, which is Number FCC-07-232 and is attached to the

23   plaintiff's trial memorandum, the FCC indicates that a creditor

24   is in the best position to have records kept in the usual course

25   of business showing such consent, referring to consent to call

Page 114

1    particular numbers, such as purchase agreements, sales slips, and

2    credit applications.  Should a question arise as to whether

3    express consent was provided, the burden will be on the creditor

4    to show it obtained the necessary prior express consent.

5            In this instance, although the defendant presented some

6    evidence to show they may have believed that the number didn't

7    come from -- or did come from a credit application -- it was not

8    sufficient to meet their burden and that they did not present any

9    evidence from the creditor or the records of the creditor to show

10   that it was an actual number that was provided on the credit

11   application and wasn't obtained by Washington Mutual in some

12   other fashion.

13           So based on that, I find calls were made to the

14   plaintiff without the plaintiff's prior express consent.  Then

15   the two types of calls which were complained of in count six of

16   the complaint, which is what we are travelling on; is that

17   correct, Mr. Yarbrough?

18           **MR. YARBROUGH:**  Yes, sir.

19           **THE COURT:**  Count six asks for relief because the

20   defendant placed non-emergency telephone calls to plaintiff's

21   cellular telephone using an automatic telephone dialing system,

22   or prerecorded, or artificial voice.

23           There has been no evidence, I believe before we started

24   that both parties stipulated that there was no allegation, or the

25   defendant wasn't defending saying any of these calls were

1   emergency calls.  So I find that these calls were all

2   non-emergency calls.

3          That there was a total of seventy-five calls placed by

4   the dialer, which was testified to by Ms. Johnson who counted

5   them from the appropriate corporate records.  As I said, none of

6   these calls, there was not sufficient evidence by the plaintiff

7   that any of these calls were prerecorded or artificial voices.

8   The plaintiff himself testified that he believed that he heard

9   what he interpreted as robotic calls.  He identified one of the

10  calls, which was referred to in the complaint as a robotic call.

11  The others he said he couldn't recall and subsequently the

12  plaintiff stipulated that the one that he had identified, or that

13  none of them were automatic calls, but rather were human voices.

14         The defendant presented testimony, convincing testimony

15  by Ms. Johnson that they are prohibited by Washington Mutual from

16  making calls that have artificial voices.  That they have a means

17  of auditing that to assure that it doesn't happen and that if it

18  had happened, it would indicated in their records relating to

19  this account.  So based on that, I find there were no

20  prerecorded, artificial voice calls made.

21         However, I do find that there was an automatic

22  telephone dialing system used.  Ms. Johnson indicated that there

23  was a dialer used, that was computer assisted, that did not

24  require a human to make the particular call.  Counsel has argued

25  that although a human may not be required to make the particular

1   call, that humans were involved in the placing of the call,

2   because the humans loaded the computers with the appropriate

3   phone information.  That it wasn't just taken off the Internet or

4   taken from yellow pages or white pages or something of that sort.

5          I am in agreement with Judge Dimitrouleas analysis in

6   Hicks versus Client Services where under similar circumstances,

7   he found that in a situation similar to this, where the defendant

8   argued that the numbers were loaded by humans into the auto

9   dialers, that was not sufficient to take them out of the auto

10  dialer was defined by the FCC.

11         So based on that, I find there were seventy-five

12  violations by the defendant.  I find there is a lack of evidence

13  to show that these violations were willful.  According to

14  Ms. Johnson's -- willful is the standard; is that correct?

15         **MR. GOLDEN:**  Yes, sir.

16         **MR. YARBROUGH:**  Willful or knowing.

17         **THE COURT:**  Willful or knowing, Ms. Johnson testified

18  that they have a relationship, an ongoing relationship with

19  Washington Mutual.  That she is under the belief that they don't

20  receive numbers that were not provided, that were not included on

21  a credit application.  They have the ability to scrub for cell

22  numbers, if they believe they have that kind of information, and

23  didn't have that kind of information in this instance.  They

24  relied on Washington Mutual.

25         There is also some evidence in the record that the

1    number that was dialed as the cell phone of the plaintiff is

2    indicated in the computer records as being a work phone, rather

3    than a cell phone.  The defendant relied on that in making these

4    phone calls.  So I find that the violation is not willful.

5         So I guess the question that is left is what the

6    damages are.  Are the damages automatically five hundred dollars

7    for each call, or is that something that the Court has to decide?

8         **MR. YARBROUGH:**  It's automatic, your Honor.  Once there

9    has been a finding of a violation, it is five hundred per call.

10        **THE COURT:**  Okay.

11        **MR. GOLDEN:**  I agree with that, your Honor.

12        **THE COURT:**  Okay, then I will issue judgment in the

13   amount of $37,500; is that correct?

14        **MR. YARBROUGH:**  Yes sir.

15        **MR. GOLDEN:**  Yes, sir.

16        **THE COURT:**  All right, any questions or anything that

17   you need clarified as to my findings of fact or findings of law?

18        **MR. GOLDEN:**  No, sir.

19        **MR. YARBROUGH:**  No, sir.  I apologize for my inartful

20   appearance here.  Your Honor, in civil cases we have such a rare

21   opportunity to appear before a Court and to have a trial, that

22   you just don't get the experience and I should have gotten it

23   when I first got out of law school and I didn't and I regret it.

24        **THE COURT:**  No, what you should have done is you should

25   have deposed the witness before you called her here.

Page 118

1          **MR. YARBROUGH:**  Well, all is well that ends well and I

2     will do that in the future.  Thank you, your Honor

3          **THE COURT:**  Court is in recess.

4          **MR. YARBROUGH:**  And the Court will issue a judgment?

5          **THE COURT:**  Yes, in the amount of $37,500.  There are

6     no attorneys fees in this case, right?

7          **MR. YARBROUGH:**  Oh, but, your Honor, there is a

8     remaining issue.  Part of our agreement of our settlement on the

9     other case, was that  this Court would determine the fees and

10    costs due to us on portion of the case.  So we have to file a

11    motion for fees and costs within thirty days, because the Judge

12    who had it before, told us he was going to hold off on that until

13    the end of the trial.

14         **THE COURT:**  Okay, you have thirty days from the date

15    that the judgment is entered in this case which will be probably

16    today or tomorrow to file.  Under the local rules you are

17    automatically given thirty days to file motion for costs and

18    fees. Thank you.

19              (Thereupon the proceedings were concluded.)

20

21

22

23

24

25

Page 119

CERTIFICATE

1

2

3       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA
4       MIAMI DIVISION

5

6              I, SUSAN SUDDARTH, a Notary Public in and for the State of

7       Florida at Large, DO HEREBY CERTIFY that the foregoing BENCH

8       TRIAL was taken before me at the time and place therein

9       designated; and the foregoing pages 1 through 119 inclusive are a

10      true and correct record of the proceedings.

11             I FURTHER CERTIFY that I am not a relative or employee of

12      any of the parties, nor relative or employee of such attorney or

13      counsel, or financially interested in the foregoing action.

14             WITNESS MY HAND AND SEAL this 2nd day of November 2009.

15

16                                         _Susan Suddarth_

17                                         Susan Suddarth - Notary Public
                                           State of Florida at Large
18                                         Commission #DD813800
                                           Expires October 2, 2012?

19

20

21

22

23

24

25

OFFICIAL REPORTING SERVICES, LLC (954) 467-8204

1

2